James O'Hear SANDERS, Plaintiff,

v.

James H. GRAY, as Chairman of the Georgia State Democratic Executive Committee,

George D. Stewart, as Secretary of the Georgia State Democratic Executive Committee,

The Georgia State Democratic Executive Committee,

The Georgia State Democratic Party, and Ben W. Fortson, Jr., as Secretary of State of the State of Georgia, Defendants.

Civ. A. No. 7872.

United States District Court
N. D. Georgia.
April 28, 1962.

Heyman, Abram, Young, Hicks & Maloof, Atlanta, Ga., for plaintiff.

Eugene Cook, Atty. Gen. of Georgia, B. D. Murphy, E. Freeman Leverett, and Lamar W. Sizemore, Atlanta, Ga., for defendants.

Before TUTTLE and BELL, Circuit Judges, and HOOPER, District Judge.

GRIFFIN B. BELL, Circuit Judge.

Plaintiff seeks declaratory and injunctive relief alleging deprivation of federal constitutional rights. The prayer seeks to restrain the Georgia State Democratic Party and the Chairman and Secretary of the Georgia State Democratic Executive Committee in their representative capacities, and their successors in office, from conducting elections under the County Unit System; from tabulating and consolidating ballots cast in the democratic primary election to be held on September 12, 1962, and in any other primary election conducted by that party on the basis of the County Unit System; from selecting any nominee on the basis of ballots cast in any primary election held on the County Unit System; from publishing or certifying the nomination of any candidate for United States Senator, Governor, Lieutenant Governor, Justice of the Supreme Court, Judge of the Court of Appeals, Secretary of State, Attorney General, Comptroller General, Commissioner of Labor, and State Treasurer on the basis of the County Unit System; and from giving force and effect to the County Unit System as it is established under the Neill Primary Act, §§ 34–3212 through 34–3218 (Ga.Code Annot.Supp.), Georgia Laws 1917, p. 183 et seq., Ga.Laws 1950, p. 79 et seq. The prayer is also to restrain the Secretary of State of Georgia, and his successors in office, from certifying to the several ordinaries of the State of Georgia the names of any candidates for nomination to state-wide offices who shall have been nominated in any primary held by the Democratic Party under the County Unit System; and from furnishing to the several ordinaries official ballots and election supplies whereon nomination under the County Unit System is recognized. Lastly, plaintiff seeks judgment to the effect that the Neill Primary Act is void and unconstitutional insofar as it provides for the nomination by the defendant party of any candidates for the named offices under the County Unit System.

Plaintiff is an elector within the meaning of Article II, § I, Paragraphs I through IV of the Constitution of the State of Georgia of 1945, Ga.Code §§ 2–701 through 2–704. He is qualified to vote in primary and general elections in Fulton County, is a member of the Democratic Party of Georgia, intends to vote in the democratic primary election to be held within the State of Georgia in 1962 and intends to support the nominees of such primary in the general election to be held on the Tuesday after the first Monday in November, 1962.

Defendant Democratic Executive Committee, an unincorporated association, is the governing body of the defendant Democratic Party of Georgia, also an unincorporated association, and which is composed of many thousands of persons residing throughout the State of Georgia. Defendants Gray and Stewart are Chairman and Secretary, respectively, of the Executive Committee. Defendant Fortson is Secretary of State of the State of Georgia.[1]

Defendant Committee, as the governing body of defendant party, intends to supervise the holding of the primary election, to tabulate and consolidate the ballots cast therein and to certify to defendant Secretary of State the names of persons determined by that committee to have been nominated in the primary election, all as provided by the statutes of Georgia. The Secretary of State, pursuant to statute, will furnish to the several ordinaries of the State of Georgia official ballots and election supplies and will certify to the ordinaries the names of the candidates nominated in the primary. The ordinaries will in turn submit the names of the candidates to the electors of the State of Georgia for their choice in the general election in November.

Plaintiff contends in his suit that the County Unit System is arbitrary and discriminatory to the extent that it is a denial to him of equal protection of the laws within the meaning of the Fourteenth Amendment to the Federal Constitution in that Fulton County where he resides, the largest county in Georgia, is allotted only six unit votes under the statute which in total allows six unit votes each for the eight largest counties by population in Georgia, four unit votes for each of the thirty next largest by population and two each for the remaining one hundred twenty one counties. According to the 1960 United States census Fulton County had a population of 556,326 while Georgia had a total population according to the same source of 3,943,116, Fulton County thus having 14.11 percent of the total population of Georgia but only 1.46 percent of the total of 410 county unit votes. On the other hand, the least populous county in Georgia, Echols, had a population according to the 1960 census of 1876 or .05 percent of the population in the state, and is accorded two units or .48 percent of the total units. Thus the discrimination runs against Fulton County on an approximate ten to one ratio based on population and in favor of Echols County on an approximate ten to one ratio. The discriminatory ratio under the County Unit System runs, based on the 1960 census, between these ranges but in every instance against Fulton County. The Unit System also accords to the candidate receiving the plurality of votes in a county the entire unit vote thus reversing the votes of those voting for another candidate just as is the case under the Federal Electoral College System.

Plaintiff asserts, in addition to his Fourteenth Amendment claim, that the System violates the Seventeenth Amendment which provides that the Senators from each state shall be elected by the people thereof.

---

1. The facts in this memorandum opinion are to be considered as findings of fact within the meaning of Rule 52(a), Fed. R.Civ.P., 28 U.S.C.A. cf. Myles v. Quinn Menhaden Fisheries, Inc., 5 Cir., 1962, 302 F.2d 146, and are based on the verified pleadings, and the evidence submitted on the hearing, together with liberal use of our right to take judicial notice of matters of common knowledge and public concern. 31 C.J.S. Evidence §§ 6–27, 32, 37, 40–43, 51, 58–61, 97, 98.

He alleges that he is without adequate remedy at law in view of the holding of the Supreme Court of Georgia in the case of Cox v. Peters, 1951, 208 Ga. 498, 67 S.E.2d 579, appeal dismissed, 342 U.S. 936, 72 S.Ct. 559, 96 L.Ed. 697 (1952), that an action at law for damages will not lie in favor of one aggrieved by reason of the application of the County Unit System. Jurisdiction and three-judge status is based on Title 28 U.S.C.A. §§ 1343, 2201–2202, 2281 and 42 U.S.C.A. § 1983.

*History of the County Unit System*

The County Unit System throughout its long use in primary elections in Georgia, first by party rule and later by statute, has always been based on the formula obtaining for apportionment of the House of Representatives.[2] Thus we look first to the history of apportionment in the House of Representatives of Georgia. Eight counties were established under the first state constitution, 1777, from which representatives were to be elected annually by the voters; Liberty County electing fourteen representatives, Glynn and Camden one each, the other counties ten each, with the Port and Town of Savannah to have four to represent their trade and the Port and Town of Sunbury to have two to represent their trade. Glynn, Camden and all counties thereafter laid out were to have one representative provided there were ten electors in the county, then two representa-

tives for thirty electors, three for forty, four for fifty, six for eighty, and ten for a hundred or more electors. After reaching a hundred electors a county would be entitled to two executive councilors among the number of representatives. These representatives were to meet and from their number select two from each county to constitute a Council and to elect a governor. The remaining representatives were to constitute the "house of assembly." Georgia Const. of 1777, Articles II–V; McElreath on the Constitution of Georgia (1911), pp. 230–231; South v. Peters, N.D.Ga., 1950, 89 F. Supp. 672.[3] It was under this constitution that Georgia ratified the Federal Constitution and entered the Union on January 2, 1788.

The Constitution of 1789 was then adopted. It created a general assembly consisting of a senate and house of representatives. Each county was to have one member of the Senate with terms of three years. The Members of the House were elected annually from each of the then existing eleven counties with Camden, Glynn, Effingham, Washington, Greene, and Franklin having two each, Burke, Liberty, and Richmond having four each, and Chatham and Wilkes five each, making a total of thirty four. A governor was to be elected by the Senate each two years from three persons nominated by the House of Representatives. Georgia Constitution of 1789, Article I,

2. We are not aware that the statutory primary election has ever been used by any party other than the Democratic Party although it is available to all. The County Unit System is compulsory to all parties holding primary elections.

The Republican party of Georgia, although until this year it has apparently not actually nominated any one for statewide office during this century, uses the convention system for nominating for state office in presidential election years. The convention also selects a State Central Committee which has the power to nominate candidates between quadrennial conventions, which are held during presidential election years. Delegates are elected from each county at mass meetings to the state convention. The mass

meeting must meet statutory requirements, Georgia Code, §§ 34–3401, 3402. The number of delegates per county to the state convention is, except for extra delegates given to counties voting Republican in the preceding election, in ratio to the number of Republican votes cast in the county in the last general election. See Gosnell and Anderson, The Government and Administration of Georgia, 1956, p. 37.

3. The right to vote under this Constitution was restricted to white males who owned property of a value of ten pounds, or who had a mechanic's trade and anyone who failed to vote was fined five pounds. Arts. IX, XII.

162

§§ 1–6, Article II, § 2; McElreath, pp. 242, 243, 245; South v. Peters, supra.

Under the Constitution of 1798 the principle was declared that representation in the House should thereafter be according to population on an enumeration to be made each seven years, and on the basis that population of 3,000 would entitle a county to two members of the House, 7,000 to three members, and 12,000 or over to four members, with each county to have at least one and not more than four. Constitution of 1798, Article I, § 7; McElreath, p. 252. As was said in South v. Peters, this plan was an evident reflection of Article I, § 2, cl. 3 of the Federal Constitution fixing the apportionment of representatives in Congress among the states.

The governor was to be elected by the General Assembly on joint ballot, and there were popular elections only by counties. Article II, § 2; McElreath, p. 259. In 1823 the Constitution was amended to provide, beginning in 1825, that the governor should be elected each two years by persons qualified to vote for members of the General Assembly, and if no candidate had a majority of the votes the General Assembly would elect the governor by joint ballot. McElreath, p. 273.

By an amendment proposed and assented to in 1842 and confirmed in 1843, forty seven senatorial districts were created and the number of representatives was fixed at 130, each county to have one, with no county to have more than two; the 37 counties having the greatest population were to have two each, with reapportionment to be made after each census. McElreath, p. 277. The same basis of House apportionment was carried forward, after secession, in the Georgia Confederate Constitution, Const. of 1861, Article II, § 3, par. 1; McElreath, p. 286, and in the Constitution of 1865, adopted upon the cessation of hostilities and during the Presidential Reconstruction of Georgia. Const. of 1865,

Article II, § III, par. 1; McElreath, p. 304.

The Constitution of 1868 was adopted during the second or Congressional Reconstruction and as a prerequisite to the end of the occupation of Georgia by Federal troops.[4] It provided the three-two-one formula of apportionment in the House, which is still in use in Georgia. The House was to consist of 175 members, apportioned three each to the six largest counties, two each to the thirty one next largest, and one each to the remaining counties. The apportionment might be changed after each federal census but the total membership was not to be increased. Constitution of 1868, Article III, § 3, par. 1; McElreath, p. 327.

Fulton had the smallest population of any of the six largest counties, Chatham, Richmond, Burke, Bibb and Houston being larger in that order. They each had 1.7 percent of the House representation. Fulton had only 1.36 percent of the total population while, for example, Chatham had 2.9 percent and Richmond 2.0 percent of the population. Compendium, 9th Census of the U. S. Fulton had an equality ratio based on population of 121 percent. Stated differently, Fulton had 121 percent of the number of representatives while being entitled to 100 percent on a pure population basis. On the other hand, Chatham County had an equality ratio of only 59 percent while that of Richmond was 85 percent.

The Constitution of 1877 was next adopted and it was followed by the Constitution of 1945. The apportionment formula was changed by the Constitution of 1877 to the extent that it reduced the number of two representative counties from thirty one to twenty six. Changes in the total number of representatives were made from time to time because of the creation of new counties and the total was 189 at the time of the adoption of the Neill Primary Act in 1917. The situation with respect to the creation of new counties stabilized and the last county to be created in Georgia

4. Saye, A Constitutional History of Georgia, pp. 256–272.

was Peach in 1924, making a total of 161 counties. Since then two counties have been abolished by merger with Fulton (Milton and Campbell) but Fulton did not get their representation. Since 1920 the formula has been three representatives on the basis of population for the eight largest counties, two for the thirty next largest and one each for the balance. Reapportionment within the limits of the formula on population was mandatory after each Federal census and has been effected to date. The Constitution of 1877, Article III, § 3, pars. 1, 2; McElreath, p. 358.

We turn now to the history of primary elections held by the Democratic Party in Georgia. Prior to the Civil War the predominant parties in Georgia were the Democrats and Whigs. The Democrats took control when the war ended but were soon ousted by the Republicans. A Republican governor served from 1868 until the end of 1871 when the Democrats regained control to remain the dominant party at all times since then. The most serious competition to the Democrats was the Populist movement in the 1890's. This party elected five senators and forty seven representatives to the General Assembly in 1894 and polled 44½ percent of the total vote cast. Coulter, Georgia, A Short History (1961), pp. 362–380, 392–396. See also Arnett, Populist Movement in Georgia (1922).

Dr. Saye, supra, pp. 356–358 succinctly sets out the history of party nominating methods in Georgia and the events leading up to the Neill Primary Act:

"In the election of 1918, Governor Dorsey was unopposed for reelection, * * *.

"The first session of the General Assembly during Dorsey's administration passed the Neill Primary Act, destined to be of far-reaching significance in the future political history of the State. Beginning with California in 1866, several states introduced legal regulations of primary elections soon after the Civil War, but in Georgia primaries continued to be managed by political parties with little legal restraint. An act of 1887 prohibited the giving or furnishing of liquor within a certain distance of polling places on election days and gave legal recognition to the existence of primaries, and an act of 1891 prescribed several regulations, but left their use optional with the political parties. Several laws on the subject were enacted during the first decade of the twentieth century, including an act of 1904 making it a misdemeanor to buy votes and an act of 1908 requiring that primaries for the nomination of State officers be held on the same date in all counties. Yet primary elections continued to be governed largely by party custom and rules.

"Prior to 1886 diverse methods had been used to select delegates to State conventions of political parties —mass meetings in county courthouses, meetings in militia districts to select delegates to county meetings, or appointment by county executive committees. Relatively few delegates had been chosen by actual vote of the people. In that year Henry Grady, managing Gordon's campaign for Governor, effectively offset the advantage that Augustus O. Bacon held in the party organization by an appeal to the people, to revolt against the politicians and elect their own delegates to the Democratic State Convention. In 1890 the State Democratic Executive Committee recommended the use of primaries in selecting delegates to the State Convention, and eight years later the Democratic Party required this procedure. Delegates from each county to the State Convention of the Party were to be chosen by the county executive committees from the friends of the gubernatorial candidate receiving the largest popular vote in the county, and they were required to vote for State officers in the conven-

tion according to the vote of the people in their county.

"The county unit rule, under which the number of votes of a county in the State Convention was determined by its representation in the House of Representatives, was used from the very beginning of primaries by the Democratic Party, except in 1908, as noted above. * * * " 5

The movement to make statutory what had been voluntary was given additional impetus by the adoption of the Seventeenth Amendment to the Federal Constitution in 1913 requiring United States Senators to be elected by the people instead of by the state legislature as had been the practice. And with the adoption of the Primary Act, for the Democratic Party at least so long as it is used, the direct primary displaced the county mass meeting or caucus followed by the state convention as a method of choosing party candidates for the general election, and county units displaced county delegates.[6]

Based on the 1910 census, Fulton was the largest county when the Act was adopted in 1917 and the equality ratio for it under the Unit System, tied as it was to apportionment, had decreased from an advantage of 121 percent in 1868 over 100 to a disadvantage of 23.5 percent to 100.

After the primary is held, delegates are selected on the county unit basis from each county to attend the state convention where a platform is adopted, the votes canvassed and the names of the candidates winning the primary are ratified and certified to the Secretary of State for entry in the general election.

Under the Unit System candidates for governor and United States senator are required to receive a majority of the votes cast to secure the respective nominations out of the total of 410 county unit votes (two for each member of the House of Representatives). In the event of a tie the candidate with the largest popular vote becomes the nominee. A second or run off primary is held if no candidate has the majority. A plurality is sufficient as to the other offices to which the County Unit System applies.

The County Unit System as embraced in the Neill Primary Act is statutory only and a concerted effort was made in 1950 and again in 1952 to amend the Constitution to include it. The amendment was defeated in the 1950 general election on a popular vote basis 164,377 to 134,290, but the amendment would have carried 230 to 183 on a county unit basis. There were 309,170 votes against it and 279,882 for it in 1952 but the county unit vote would have been 264 votes for and 146 against. Rigdon, supra, pp. 36, 39.

### Previous Litigation Concerning the County Unit System

The validity of the County Unit System was first challenged in the case of Cook v. Fortson, N.D.Ga., 1946, 68 F. Supp. 624, where an effort was made to have the county unit rule and the statutes permitting its use declared unconstitutional, and to enjoin its use in determining the democratic nominee for Congress for the Fifth District of Georgia. The winner received a majority of the county unit vote but another candidate received a majority of the popular vote. Injunctive relief was denied on the basis of Colegrove v. Green, 1946, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432, leaving the inequality complained of for consideration by the State Legislature or by

5. The main issue in the 1908 Democratic primary campaign was the effort of Hoke Smith to reform the "Undemocratic County Unit System whereby some country dwellers were given representation fifty times greater than that held by people living in large cities." The primary was held on a popular vote basis and Smith was defeated by Joseph M. Brown, who with Thomas E. Watson, supported the Unit System. Coulter, supra, p. 399.

6. For other histories of Georgia political convention methods and the County Unit System see Coulter, supra; Gosnell and Anderson, supra; and Rigdon, Georgia's County Unit System (1961), pp. 23–27; see also Turman v. Duckworth, infra, and South v. Peters, supra.

the Congress under Article I, § 4 of the Federal Constitution. The court doubted that the county unit rule could be said to be imposed on a congressional primary by the state at all so as to bring the Fourteenth Amendment into operation since the statute, § 34–3217, provides that it shall not be construed to require any definite unit of election of candidates for primary nomination for Congress. If imposed it is done by action of the Democratic Committee for the Congressional District and not by statute, and this was expressly stated in the state party rules. The court said that at any rate the State Democratic Executive Committee had in effect cancelled the primary by certifying both candidates to the Secretary of State for inclusion on the general election ballot where all Democrats would be free to vote their choice on a popular vote basis.

In Turman v. Duckworth, N.D.Ga., 1946, 68 F.Supp. 744, plaintiffs challenged the use of the County Unit System in the statewide gubernatorial primary. One candidate received a plurality of the popular vote but the winner received a majority of the unit votes. An interlocutory injunction was denied. The court noted that plaintiff had not moved to assert the invalidity of the unit system before the Executive Committee set the primary, and before it was too late to have another primary or even a convention nomination. The court stated that the power and duty of the court to act is plain where a criminal statute about a political matter is involved, In re Yarbrough, 1884, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed 274, and United States v. Classic, 1941, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368, or where there is involved a statutory right of action for damages, as in Nixon v. Herndon, 1927, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759; Smith v. Allwright, 1944, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987, and King v. Chapman, 5 Cir., 1946, 154 F.2d 460, but denied relief on the basis of Colegrove, supra. The court then made an additional statement for use in considering the merits in the event of appeal, and held that it had not been shown that the State of Georgia had deprived plaintiffs of the equal protection of the laws, recognizing however the primary as state action within the meaning of the Fourteenth Amendment. King v. Chapman, supra. It was pointed out that neither the state nor federal government had ever sought or demanded that voters should have equal voting influence, referring to the electoral college under which there have been presidents who did not receive a majority of the popular votes, and to the fact that the great political parties in their state and national organizations have based representation in the nominating conventions on the legislative strength of the states or counties represented. The court recognized the inequality between the less populated counties and Fulton County in representation in the legislature, and by consequence in applying the county unit rule to a primary, but stated that the remedy was through changes in the law rather than by appeals to courts of equity. It is a fair statement to say that the *ratio decidendi* of this case, like Cook is that the decision of the court was controlled by the Colegrove case involving congressional reapportionment in Illinois.

Both the Cook case and the Turman case were dismissed on appeal to the Supreme Court, with the authority cited being a case on mootness. Justices Black and Murphy were of the opinion that probable jurisdiction should be noted, with Justice Rutledge being of the opinion that the question of jurisdiction should be postponed until a hearing on the merits. 1945, 329 U.S. 675, 67 S.Ct. 21, 91 L.Ed. 596 (October 28, 1946).

Another suit was instituted in 1950, this time prior to the primary, challenging the unit system and it was dismissed by the District Court. South v. Peters, 89 F.Supp. 672 (N.D.Ga., 1950), Judge Andrews dissenting. The Supreme Court affirmed per curiam, 339 U.S. 276, 70 S.Ct. 641, 94 L.Ed. 834, saying, "Federal courts consistently refuse to exercise their equity powers in cases posing political issues arising from a state's geo-

graphical distribution of electoral strength among its political subdivisions," citing MacDougall v. Green, 1948, 335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3; Colegrove, supra; Wood v. Broom, 1932, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131; and Johnson v. Stevenson, 5 Cir., 1948, 170 F.2d 108. South v. Peters, 1950, 339 U.S. 276, 70 S.Ct. 641, 94 L.Ed. 834. Justices Douglas and Black dissented from the dismissal on the grounds that the right to vote in a primary where the discrimination is based on race, creed or color was held in Nixon v. Herndon, supra, to be covered by the equal protection clause of the Fourteenth Amendment, and the right to vote under such circumstances is protected by the Fifteenth Amendment. Smith v. Allwright, supra, and United States v. Classic, supra. They thought the evidence regarding the County Unit System indicated equally invidious discrimination. The County Unit System would fall under the equal protection clause, and by reason of violating Article I, § 2 of the Constitution providing that members of the House of Representatives shall be chosen by the people (not here involved) and the Seventeenth Amendment providing that senators shall be elected by the people. They set out their view of what the rule should be and it turned out to be the forerunner of things to come, Baker v. Carr, 82 S.Ct. 691. It was that "the only tenable premise under the Fourteenth, Fifteenth, and Seventeenth Amendments is that where nominations are made in primary elections, there shall be no inequality in voting power by reason of race, creed, color or other invidious discrimination."

In Cox v. Peters, supra, suit was brought for damages under 8 U.S.C.A. § 43 against Georgia election officials alleging that a voter in the 1950 gubernatorial primary had been denied full enjoyment of his right to vote by reason of the County Unit System. The Georgia Supreme Court affirmed a dismissal of the suit, saying that the right to vote in a gubernatorial primary was not derived from the United States Constitution, and that the Georgia constitutional and statutory provisions asserted were applicable only to elections and that the primary was not the equivalent of an election, but only a substitute for a party convention. The United States Supreme Court dismissed for want of a substantial federal question, Justices Black and Douglas dissenting. Cox v. Peters, 1952, 342 U.S. 936, 72 S.Ct. 559, 96 L.Ed. 697.

A fourth attempt failed in 1958 when plaintiff was unsuccessful in obtaining the appointment of a three-judge court to consider the question. Hartsfield v. Sloan, leave to file petition for writ of mandamus denied, five to four, 357 U.S. 916, 78 S.Ct. 1363, 2 L.Ed.2d 1363 (1958).[7]

### Jurisdiction, Justiciability, Standing and The Question Presented

A calm in litigation ensued thereafter as to the County Unit System while so-called reapportionment litigation was taking place in other states and some at least was pending before the Supreme Court. Baker v. Carr, supra. The instant litigation was filed shortly after the announcement of the decision in that case, and on the same day. A three-judge court was duly constituted and the matter came on promptly for hearing on the application for interlocutory injunction.

 That case involved the apportionment of the Tennessee State Legislature. The court held that the District Court possessed jurisdiction of the subject matter, and that a justiciable cause of action was stated upon which the appellants, residents and voters of Tennessee claiming arbitrary and capricious state action offensive to the Fourteenth Amendment, had standing to maintain the suit. The rationale of that decision

---

7. What has been heretofore stated was prepared before the hearing and before the General Assembly amended the Neill Primary Act, as will be hereinafter discussed. This was done in order to expedite a decision in a matter of such public importance.

encompasses the cause of action here. We, accordingly, take jurisdiction and also hold that plaintiff has standing to maintain the suit and that the complaint sets out a justiciable issue.

█ In doing so, we, of course, resolve in favor of the plaintiff the question whether the Fourteenth Amendment protection extends to alleged deprivation of equal protection occurring in a Primary, as distinguished from a General election.

Much has been said in briefs and oral argument as to the place which the Primary in the State of Georgia has traditionally played in the election process. It is a fact known to all that the Democratic candidate has, without exception, at least during the present century, been the choice of the voters at the General election. On the other hand, it is pointed out that at least with respect to the office of Governor, a candidate has been nominated by the Republican party to participate in the General election in November of this year. Our conclusion that the protection of the Fourteenth Amendment extends to invidious discriminations if they exist in a party primary in Georgia in no way depends upon the degree to which the Democratic party primary is tantamount to the final election. It is based rather on prior decisions of the Court of Appeals for the Fifth Circuit, where it has been held that the conduct of a Primary election in Georgia is such an essential part in the total election process, its conduct and management is so closely supervised by State law and the effect to be given it is so clearly determined by statute that the action of the party in the conduct of its primary constitutes state action within the contemplation of the Fourteenth Amendment to the Constitution (Chapman v. King, 5 Cir., 154 F.2d 460).[8] Touching on this matter Judge Sibley's opinion said:

"We think these provisions show that the State, through the managers it requires, collaborates in the conduct of the primary, and puts its power behind the rules of the party. It adopts the primary as a part of the public election machinery." Chapman v. King, supra, p. 464.

See also Smith v. Allright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987, and United States v. Classic, 313 U.S. 299, 61 S. Ct. 1031, 85 L.Ed. 1368.

8. As pointed out in the opinion written by Judge Sibley for the Court in Chapman v. King, supra:

" * * * The State collaborates in these ways: It prohibits anyone to participate in any primary or convention of any political party who is not a qualified voter. Georgia Code § 2–608, Constitution, Art. II [since repealed] Sect. I, Par. 8. The State furnishes its list of registered voters and these voters alone are declared entitled to vote in primaries as well as in general elections. Georgia Code, § 34–405. And the State registrars are required to be at the court house during the voting hours of the primary as fixed by law § 34–2001a, to make corrections in the list [since repealed] § 34–411 (Supplement). The State requires the party to select election managers, and requires each manager to take an oath that he will fairly and impartially and honestly conduct the election according to the provisions of law. § 34–3201. If a voter is challenged, they are required to administer to him an oath that he is duly qualified to vote 'according to the rules of the party, and according to the election laws of this State.' § 34–3202. All the laws in reference to the qualification of voters and their registration are applied to primaries, and 'No person who is not a duly qualified and registered voter according to law and who is not also duly qualified in accordance with the rules and regulations of the party holding the same, shall be entitled to vote at any such primary election.' § 34–3218. If the challenged voter swears falsely, the State will punish him. § 34–9925. No one but a sworn manager can have any part in receiving or counting the votes. § 34–3205. The managers must turn over tally sheets, lists of voters, ballots and other election papers to the Clerk of the Superior Court to be kept under seal until the next grand jury meets if no contest is filed. § 34–3207. The managers are indictable for violation of their duty. §§ 34–9922, 34–9923. Generally all penal laws touching elections are extended to primaries, § 34–9933, Supplement; and § 34–9907."

The remaining questions presented are but two: Does the County Unit System as set out in the Neill Primary Act, amended, violate the right of plaintiff to equal protection of the laws under the Fourteenth Amendment or his right to vote for a United States senator under the Seventeenth Amendment. This latter right would reach the unit system only as to the primary election for the office of United States senator, while the former would reach it as to all state-wide offices. A subsidiary question of prime, even overriding importance, is the test to be applied to determine violation, and the factors to be considered in making the test.

### The Test to be Applied

 It must be borne in mind that the hearing just held is a hearing for a temporary injunction. Such a hearing differs very largely from a final hearing in equity on the merits of a case in that a plaintiff may be entitled to immediate relief where time is of the essence of the controversy, even before the parties are able to fully develop their case on the merits or before the trial court is able adequately to consider and make the proper judicial determination of all of the legal questions that arise. This case is an excellent illustration of the need for distinguishing between temporary and permanent relief. We do not doubt that the Fourteenth Amendment applies, and we proceed on that basis. We think the Court by its opinion in Baker v. Carr has now adopted the following test stated by Mr. Justice Douglas in South v. Peters, supra:

> "Where nominations are made in primary elections, there shall be no inequality in voting power by reason of race, creed, color or other invidious discrimination." [9]

Having applied the equal protection clause of the Fourteenth Amendment to the rights of plaintiff in this suit, and having set aside for the purpose of this hearing and decision the other points raised by all parties, we apply the test of invidious discrimination. We need not apply it of course to the "time honored" system but to the system which is new as of yesterday. And as a part of the application of the test we hold that a political party may use a county unit system in primary elections for the nomination of candidates in the general election if the system, as we shall point out, does not run afoul of constitutional inhibitions.

A test for invidiousness must be formulated. Unlike per se invidiousness, springing from discrimination based on race, creed or color, we must here deal with discrimination not so infected, but arising out of a state legislative classification diffusing party political strength. The diffusion is between counties of all sizes, sparsely to densely populated, apparently on a rural-urban basis, but weighted from top to bottom, county by county, in favor of the next smaller.

We make the test on a consideration of all relevant factors, and these include rationality of state policy. See the concurring opinion of Mr. Justice Clark in Baker v. Carr where the dismissal of the appeal in South v. Peters, supra, was said to reflect the viewpoint of the Supreme Court "to refrain from intervening where there is some rational policy behind the State's system."

Another test is whether or not the system is arbitrary. The right of plaintiff in this connection depends upon the treatment accorded his unit. His unit, Fulton County, must be related to the state as a whole in measuring his right, and his right is the same as that of all

---

9. Webster's International Dictionary gives the following definition for "invidious":

"1. Tending to excite odium, ill will, or envy; likely to give offense; esp., unjustly and irritatingly discriminating; as invidious distinctions."

The same dictionary gives the following definition for "discrimination":

"1. Act of discriminating, or state of being discriminated."

Referring to the definition of "discriminate" in the same dictionary, we find the following definition:

"1. Having the difference marked, distinguished by certain tokens; distinct."

other Democrats in his unit. The fact that Echols or some other small county receives more than its share is of no concern to Fulton County so long as it is accorded proper treatment. And the consideration of this factor includes the applicability of the diffusion principle—the right of a state to properly diffuse "political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former. The Constitution—a practical instrument of government—makes no such demands on the States." MacDougall v. Green, supra, 335 U.S. at page 284, 69 S.Ct. at page 2, 93 L.Ed. 3. We have considered too the genesis of the System, whether or not it was for a fair purpose in the beginning—that it was is self-evident from the history heretofore set out.

Another important factor to be considered in making the test is whether or not the unit system has a historical basis in our political institutions, both federal and state. The primary in Georgia and elsewhere simply took the place of the convention. The county units took the place of county delegates. Counties were governmental units in Georgia before the Union and had their voice in the councils of government on the state level through representation, rationally apportioned, first on number of electors and and later on population, but never in any exact proportion. And for many years governors were elected by these representatives. With the advent of popular elections of the governor and other state officials, conventions with delegate strength by party rule based on county apportionment in the House of Representatives became the medium of nomination. Delegates were elected, not by direct primary, but at county mass meetings. This was followed by the county primary for the election of delegates—still in the ratio of legislative apportionment, and later by statewide primaries but still by party rule. And this finally

became the statutory mode—as in the statute under attack here.

The national conventions of the great political parties use the congressional apportionment formula to a large extent in arriving at delegate strength. This gives some of the smaller states an advantage over the larger states and other factors, for example—the extra delegate bonus for party loyalty in past elections—cause a variance from exact apportionment.

The electoral college is not in exact proportion to population or voting strength but gives an advantage to the smaller over the larger. Recognizing that the electoral college was set up as a compromise to enable the formation of the Union among the several sovereign states, it still could hardly be said that such a system used in a state among its counties, assuming rationality and absence of arbitrariness in end result, could be termed invidious. See Wilmerding, The Electoral College (1958) for examples of inequities arising under that system. And at least one other state, Maryland, uses a County Unit System in primary elections. Rigdon, supra, pp. 70–73.

Another important consideration in making the test at least for the purpose of court intervention, is the presence or absence of political remedy. This lack is implicit in Baker v. Carr. Here we are not dealing with legislative apportionment but with the management of the state Democratic Party. Plaintiff as a Democrat is complaining of treatment received by him at the hand of other Democrats through the medium of a state statute, sponsored by a governor from his party and enacted by a legislature consisting in the main of members of his party. A political remedy encompasses the give and take within the political arena, but we must consider it, and whether there is substantial likelihood under the existing system of plaintiff's obtaining such relief measures as may be needed to accord him his constitutional rights. We hold that there is not.

An additional factor of importance, and of which we are much aware is the delicate relationship between the federal and state governments under the Constitution. It has long been the law that the violation in question must be clear before a federal court of equity will lend its power to the disruption of the state election processes.

The test is on the sum of all of these factors, and if the action—here the statute, complained of—offends what are thought to be fundamental political concepts, giving due regard to each factor and to the rights of plaintiff and all others in his suit as compared to the whole—the state, it must be stricken because of discrimination so excessive as to be invidious.

### The Merits

■ The system as it existed prior to yesterday was violative of the right of plaintiff to equal protection of the laws. The system as it exists today is an improvement, and is the result of an effort on the part of the responsible state officials and the General Assembly of Georgia within recent days to comport with sharp new legal precedents. But even the new system misses the mark in two respects: first in failing to accord the unit of plaintiff a reasonable proportion of the whole, and second in failing to accord the units representing a majority of the population a reasonable proportion of the whole. We do not strike the county unit system as such. We do strike it in its present form.[10]

■ And while it may appear doctrinaire to some extent in the application of such broad constitutional rights as equal protection, MacDougall, supra, to state definite standards, we nevertheless, because, and only because, it is a question of much public moment, hold that a unit system for use in a party primary is invidiously discriminatory if any unit has less than its share to the nearest whole number proportionate to population, or to the whole of the vote in a recent party gubernatorial primary, or to the whole vote for electors of the party in a recent presidential election; provided no discrimination is deemed to be invidious under the system if the disparity against any county is not in excess of the disparity that exists against any state in the most recent electorial college allocation, or under the equal proportions formula for representation of the several states in the Congress, and provided it is adjusted to accord with changes in the basis at least once each ten years. This is a "judicially manageable standard" contemplated in Baker v. Carr, supra.

10. The following table will illustrate how under the recent statute the vote of each citizen counts for less and less as the population of the county of his residence increases, this table covering only the four largest and four smallest counties in comparison with Fulton, the largest:

| County Number | Name | Population | Number Unit Votes | Population per unit vote | Ratio to Fulton County |
|---|---|---|---|---|---|
| 1 | Fulton | 556.326 | 40 | 13,908 | |
| 2 | DeKalb | 256,782 | 20 | 12,839 | |
| 3 | Chatham | 188,299 | 16 | 11,760 | |
| 4 | Muscogee | 158,623 | 14 | 11,330 | |
| 156 | Webster | 3,247 | 2 | 1,623 | 8 to 1 |
| 157 | Glascock | 2,672 | 2 | 1,336 | 10 to 1 |
| 158 | Quitman | 2,432 | 2 | 1,216 | 11 to 1 |
| 159 | Echols | 1,876 | 2 | 938 | 14 to 1 |

There are 97 two-unit counties, totalling 194 unit votes, and 22 counties totalling 66 unit votes, altogether 260 unit votes, within 14 of a majority; but no county in the above has as much as 20,000 population. The remaining 40 counties range in population from 20,481 to 556,326, but they control altogether only 287 county unit votes. Combination of the units from the counties having the smallest poulation gives counties having population of one-third of the total in the state a clear majority of county units.

Due consideration has been given to delaying the entry of an injunction until the next regular session of the General Assembly in January but having recognized the constitutional right of plaintiff, we cannot fail to protect it, nor do we believe the state would want to deny it in the fall primary.

An interlocutory injunction will be entered enjoining and restraining defendants from giving application to the County Unit System by statute or party rule in any election where the allocation of units falls short of this standard.