Henry J. TOOMBS, Mrs. George Taylor Douglas, Gordon G. Johnson and John L. Glenn, Plaintiffs,

v.

Ben W. FORTSON, Jr., as Secretary of State of Georgia, Eugene Gunby, Ordinary of Fulton County, Georgia, Katherine E. Mann, Ordinary of DeKalb County, Georgia, James F. White, Ordinary of Fayette County, Georgia, A. B. Tollison, Ordinary of Forsyth County, Georgia, Robert F. Abercrombie, Ordinary of Douglas County, Georgia, Jim W. Dickerson, Ordinary of Cherokee County, Georgia, et al., Defendants.

Civ. A. No. 7883.

United States District Court
N. D. Georgia,
Atlanta Division.
May 25, 1962.

Francis Schackelford, Hamilton Lokey, Atlanta, Ga., Joseph B. Cummings, Augusta, Ga., Edward S. White, Isreal Katz, Atlanta, Ga., William P. Gunter, A. R. Kenyon, Gainesville, Ga., Maurice N. Maloof, C. Baxter Jones, Jr., Atlanta, Ga., J. Quinton Davidson, Columbus, Ga., Albert P. Reichert, Macon, Ga., John E. Simpson, Savannah, Ga., Raymond M. Reed, Marietta, Ga., John W. Sognier, Savannah, Ga., for plaintiffs.

King & Spalding, Eugene Cook, Atty. Gen., State of Georgia, B. D. Murphy, Atlanta, Ga., E. Freeman Leverett, Elberton, Ga., Lamar W. Sizemore, Atlanta, Ga., George P. Dillard, Decatur, Ga., for defendants.

Before TUTTLE and BELL, Circuit Judges, and MORGAN, District Judge.

TUTTLE, Circuit Judge.

This is the second suit to be tried before a three-judge court sitting in and for the Northern District of Georgia, in which Georgia citizens seek relief from alleged unconstitutional inequalities existing under the present composition of the Georgia state governmental structure. The first suit, Sanders v. Gray, D.C., 203 F.Supp. 158, resulted in the court's holding that the county unit system by which political party primaries have been required to be held for the

election of certain State House offices is invalid because of the wide disparity between the number of units allocated to the several counties in the State when compared with the population of the counties.[1]

In this case the plaintiffs, residents of the two most populous counties in the state of Georgia, Fulton and DeKalb Counties, seek declaratory and injunctive relief to cause the reapportionment of the General Assembly of the state of Georgia, a bi-cameral legislative body consisting of a Senate and House of Representatives, to the end that the plaintiffs and the other citizens of the counties in which they reside will be represented in the Legislature by members chosen on the basis of population, rather than on the basis of geographical areas, such as counties or election districts.

Both of these suits were filed after the Supreme Court's recent decision was announced in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663.

The plaintiffs, suing on behalf of themselves "and others similarly situated," named as defendants Ben W. Fortson, Jr., Secretary of State of the State of Georgia, and six other defendants who are the duly elected Ordinaries of selected Georgia counties.[2] This is a proper case for determination by a bench composed of three judges as provided in 28 U.S.C.A. § 2281, inasmuch as it seeks interlocutory and permanent injunctions to restrain the enforcement, operation and execution of statutes and constitutional provisions of the state of Georgia on the ground that they conflict with the Constitution of the United States. The basis of the plaintiff's attack is that "the Georgia constitutional and statutory provisions herein attacked comprise a scheme of apportionment of elected representatives [to the State Legislature] whereby the representation accorded to plaintiffs and other voters in this area has been and is arbitrarily, substantially, and persistently less than that accorded to voters in other areas."

The facts are not in dispute. They are, essentially, as follows: The Georgia Legislature consists of two Houses—the Senate and the House of Representatives. The Georgia Senate has fifty-four members, each of whom is elected from a senatorial district. With two exceptions, these senatorial districts are groupings of three counties each, which are contiguous, the two exceptions being the First senatorial district consisting of Chatham County and Effingham County, and the Fifty-Second senatorial district consisting of Fulton County. At the time these exceptions were made, Fulton County was the largest county in the State in population, and Chatham County was the second largest. The remaining senatorial districts are so created as to bear no relation to the population— that is to say, there is no uniformity or approximate uniformity as between the remaining fifty-two senatorial districts.

The House of Representatives consists of 205 members representing the 159 counties of the State. The Constitution of the State of Georgia provides that the eight largest counties in population shall have three representatives each, the thirty next largest counties have two each, and the remaining 121 counties have one representative each. The population in the counties varies from a low of 1876 people in Echols County, to 556,326 in Fulton County, both according to the 1960 United States Census. In addition to the great disparity between the populations of the various senatorial districts, varying from 13,050, the smallest in population, to 556,326, the largest, Georgia laws provide that in all except the two senatorial districts above referred to, Senators shall not succeed themselves, or be succeeded by citizens of the same county. The law requires that the three counties constituting a senatorial district shall

---

1. A direct appeal has now been filed and is pending before the Supreme Court, in which the enjoined officials of the State of Georgia seek review of this decision.

2. The Ordinary in Georgia is the county officer whose duty it is to supervise primary and general elections.

furnish the Senator of the district in rotation.[3]

Furthermore, there are other provisions of the Georgia statutes that provide that where a county's candidate for election to the Senate is chosen by a primary election, only those voters from the county which is to furnish the election under the rotation system may vote in the primary. Thus the residents of two out of the three counties may not even participate in the primary which selects candidates for the senatorial district in which they reside.

Additional facts of which the Court takes judicial notice, or which were proved on the trial having a bearing on the issues here to be decided include the following:

(a) Based upon the 1960 United States Census, Senators from the 28 least populous senatorial districts of Georgia comprising a constitutional majority of the 54 members of the Senate represent districts having 21.4% of the people of the State.

(b) Under the rotation system above described, the respective counties in the 28 least populous senatorial districts of the State, which counties would be entitled to have the Senator for such respective districts at the next session of the General Assembly, have approximately 6.13% of the State's population.

(c) Of the 54 senatorial districts, the twelve most populous districts contained 55.8% of the population of Georgia. Percentage-wise these twelve senators from these districts, constituting more than a majority of the population of the State, constitute 22.2% of the total number of members of the State Senate.

(d) The 19 least populous senatorial districts of the State possess only 13% of the population of Georgia, but the Senators from these 19 senatorial districts have one more than the one-third vote needed to prevent the required two-thirds vote of the Senate to permit the submission of any constitutional amendment to the people.

(e) Representatives from the 103 least populous counties of the State, comprising a constitutional majority of the 205 members of the House of Representatives, represent counties having approximately 22½% of the population of Georgia.

(f) The eight most populous counties, containing 41% of the population of the State, elect 24 of the 205 total Representatives in the House of Representatives, constituting 11.7% of the total number of Representatives in the lower House.

(g) The 69 least populous counties having 12.17% of the total population of the State are represented by one more member of the House of Representatives than the one-third needed to prevent a two-thirds vote of the House to permit the submission of a constitutional amendment to the people of the State.

(h) Taxpayers of Fulton County, Georgia, which county has a population equalling 14% of the total of the State, provide more than 14% of the State's total revenue. Fulton County is represented in the House of Representatives by 1.4% of the Representatives in the lower House. Fulton County's one Senator is 1.8% of the total number of Senators in the upper chamber.

(i) The five-county area of Fulton, DeKalb, Cobb, Clayton and Gwinnett, which comprise the metropolitan area of the city of Atlanta, has approximately 25% of the State's population, furnishes more than 25% of the total State revenue, and has 4.3% of the Representatives in the State House of Representatives. These counties are part of senatorial districts that combined have approximately 6% of the representation in the Senate.

(j) The eight most populous counties in the State have approximately 41% of

3. Section 47–102.1 of the Georgia Code Annotated, provides in material part as follows:
"*Senators to be furnished by counties in rotation.*—The first county named in each of the above districts shall furnish the senator for the 1946 general election and after that the counties in order named above shall furnish the senator for that district * * *."

the population, furnish more than 41% of the total State revenue and are represented in the House of Representatives by 11.7% of the total number of Representatives in the lower House. These counties are parts of senatorial districts that together have approximately 13% of the membership of the Senate.

Several efforts have recently been made by individual members of the Georgia General Assembly to obtain legislation modifying in some degree the basis of representation, either by simple legislation to modify the districts for senatorial representation, or by proposing legislative study committees to consider proposed constitutional amendments to modify the 3–2–1 formula of representation in the House of Representatives. These efforts have been of no avail other than the appointment by the House of Representatives, without the concurrence of the Senate, of two House study committees on reapportionment which have thus far made no recommendations touching on reapportionment of either House of the Legislature.

Following the filing of this suit and the suit in Sanders v. Gray, supra, the Governor of the state of Georgia called the General Assembly into special session for the purpose of considering legislative reapportionment and the matters dealing with the county unit system of voting. That session of the General Assembly modified to some extent the county unit system, which, however, has now been held by the Court in Sanders v. Gray, supra, to be invalid, took no action with respect to reapportionment of the Legislature other than creation of one of the committees above referred to and has now adjourned.

### Jurisdiction, Justiciability, and Standing to Sue

Defensive pleadings filed on behalf of the Secretary of State and four of the defendant Ordinaries assert the following defenses:

(a) The Court is without jurisdiction of the subject matter of this suit.

(b) The complaint fails to state a claim upon which relief can be granted.

(c) The Court should abstain from exercising its equitable jurisdiction so far as it would otherwise consider the constitutionality of the Senate rotation plan as set out in Georgia Code, Annotated, Section 47–102 et seq., pending an authoritative interpretation by the courts of Georgia of this section of the State laws.

(d) This Court should abstain from exercising its equitable jurisdiction pending study and recommendations by a special committee of the General Assembly created by the House of Representatives at the extraordinary session just ended.

(e) A general denial of the allegations of the complaint.

Defendant Ordinary Eugene Gunby of Fulton County answered merely by stating that he would comply with the requirements of the statutes in whatever manner they should be construed. In effect his answer merely stated that the defendant, in his official capacity, would abide the final decision of the Court insofar as it becomes applicable to him, whereupon he prayed the direction of the Court.

The defendant Ordinary Mrs. Katherine Mann of DeKalb County, conceded jurisdiction and conceded that the complaint stated a claim upon which relief could and should be granted. Her answer also expressly agreed that the Senate rotation plan was invalid, and in her brief she conceded that it should be set aside. Mrs. Mann's answer also conceded all the factual allegations in the complaint.

Even a casual reading of the Supreme Court's opinions, both the majority opinion and the concurring opinions, in Baker v. Carr, supra, makes it clear that this Court has jurisdiction of the subject matter, that the issues here drawn are justiciable issues, and that these plaintiffs have standing to sue. The five defendants here who attack the plaintiffs standing were unable to distinguish the situation in which these plaintiffs find themselves from that of the plaintiffs in the Baker case. There the Supreme Court said:

"These appellants seek relief in order to protect or vindicate an interest of their own, and of those similarly situated. Their constitutional claim is, in substance, that the 1901 statute constitutes arbitrary and capricious state action, offensive to the Fourteenth Amendment in its irrational disregard of the standard of apportionment prescribed by the State's Constitution or of any standard, effecting a gross disproportion of representation to voting population. The injury which appellants assert is that this classification disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiably inequality, vis-à-vis voters in irrationally favored counties. A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution, when such impairment resulted from dilution by a false tally, c.f. United States v. Classic, 313 U.S. 299 [61 S.Ct. 1031, 85 L.Ed. 1368]; or by a refusal to count votes from arbitrarily selected precincts, c.f. United States v. Mosley, 238 U.S. 383 [35 S.Ct. 904, 59 L.Ed. 1355], or by a stuffing of the ballot box, c.f. Ex parte Siebold, 100 U.S. 371 [25 L.Ed. 717]; United States v. Saylor, 322 U.S. 385 [64 S. Ct. 1101, 88 L.Ed. 1341]."

Furthermore, the opinion stated:

"They are asserting 'a plain, direct and adequate interest in maintaining the effectiveness of their votes,' Coleman v. Miller, 307 U.S., at 438 [59 S.Ct. 972, 83 L.Ed. 1385], not merely a claim of 'the right, possessed by every citizen, to require that the Government be administered according to law * * *.' Fairchild v. Hughes, 258 U.S. 126, 129 [42 S. Ct. 274, 66 L.Ed. 499]."

As the District Court said in Sanders v. Gray, supra, at page 166 of 203 F. Supp.:

"That case involved the apportionment of the Tennessee State Legislature. The court held that the District Court possessed jurisdiction of the subject matter, and that a justiciable cause of action was stated upon which the appellants, residents and voters of Tennessee claiming arbitrary and capricious state action offensive to the Fourteenth Amendment, had standing to maintain the suit. The rationale of that decision encompasses the cause of action here. We, accordingly, take jurisdiction and also hold that plaintiff has standing to maintain the suit and that the complaint sets out a justiciable issue."

So, too, do we now hold that this Court should take jurisdiction to determine what we consider to be a justiciable issue, and we further hold that the plaintiffs have standing to maintain the suit, and that the complaint alleges facts upon which relief can be granted.

So far as concerns the defense of abstention touching on the validity of the senatorial rotation statute, we need say only that once the court finds that it has jurisdiction and power to act, and that the complaint presents a case which in general demands consideration by a Federal District Court, this Court should not abstain from disposing of the entire case rather than leaving part of it in limbo pending a later decision by a State court. So far as our abstaining from deciding the case as a whole on its merits is concerned, we think again that the contention of the five defendants urging this course of action is fully answered by the action of the Supreme Court in Baker v. Carr. We conclude that this is not a case for abstention.

### The Question Presented

The complaint in this case sufficiently alleges a case of invidious discrimination against the plaintiffs on the basis that their participation in the fashioning of the laws by which they are to be governed is fixed by a State constitutional and legislative scheme of apportionment of elected representatives in the State Legislature, which accords to voters in the

area of which plaintiffs are citizens, representation which is arbitrarily, substantially, and persistently less than that accorded to voters in other areas of the State. Only two questions remain for our determination. The first is: do the undisputed facts constitute "invidious discrimination" against the plaintiffs and those similarly situated within the meaning of this term as used by the United States Supreme Court in its latest decision? The second is: assuming an affirmative answer to the first question, what relief are the plaintiffs entitled to at the hands of the Court?

### The Test to be Applied

■ Having decided that the equal protection clause of the Fourteenth Amendment to the Federal Constitution measures the rights of the plaintiffs in this suit, and the Supreme Court in Baker v. Carr having decided that the test to be made under the Fourteenth Amendment is whether disparities between voting strengths in the state legislature constitute "invidious discrimination," we conclude that this Court must apply the same test in determining whether the plaintiffs' rights under the equal protection clause have been violated by a system of legislative representation in either or both of the chambers of the State Legislature in such manner or to such a degree as to constitute invidious discrimination as to them.

Here, as in Sanders v. Gray, "a test for invidiousness must be formulated. Unlike per se invidiousness, springing from discrimination based on race, creed or color, we must here deal with discrimination not so infected, but arising out of a state legislative classification diffusing * * * political strength. The diffusion is between counties of all sizes, sparsely to densely populated, apparently on a rural-urban basis, but weighted from top to bottom, county by county, in favor of the next smaller."

Again, as was said in Sanders v. Gray, "we make the test on a consideration of all relevant factors, and these include rationality of state policy. See the concurring opinion of Mr. Justice Clark in Baker v. Carr where the dismissal of the appeal in South v. Peters, supra [339 U. S. 276, 70 S.Ct. 641, 94 L.Ed. 834] was said to reflect the viewpoint of the Supreme Court 'to refrain from intervening where there is some rational policy behind the state system.'" Dealing, therefore, first with the question of rationality of state policy, we comment on the fact that no factual evidence has been presented to the Court upon which the Court can posit any finding, as a finding of fact, that a state policy exists which justifies the great disparities in legislative representation between the counties in which plaintiffs reside and the many other counties of the State whose representative strength exceeds that of Fulton County by as much as 98 to 1. We are left then to speculate as to whether there may be some rational policy, and we are forced to the conclusion that there is no policy but simply a reluctance of those with grossly disproportionate power over the legislative process to surrender such power. This, in our frame of reference, is not a rational, but rather an irrational, policy.

Another test is whether or not the system is arbitrary.[4] Having concluded that the gross disparities here imbedded in the makeup of the Georgia Legislature can not be related to a rational policy, we also conclude that the system is arbitrary in any sense of that term.

Another important factor to be considered in making the test is whether the

---

4. Webster's International Dictionary gives the following definition for "arbitrary":
   "2. Fixed or arrived at through an exercise of the will or by caprice, without consideration or adjustment with reference to principles, circumstances or significances * * *"

Black's Law Dictionary defines "arbitrary":
   "Without adequate determining principles; not founded in the nature of things; non-rational; not done or acting according to reason or judgment; depending on the will alone; absolutely in power; capriciously; * * *"

present complexion of the Legislature has a historical basis in our political institutions, either federal or state. The defendants urge strenuously here that the so-called "3–2–1" system of representation in the lower House and the State senatorial district system under which the State Senate is constituted has a sound, historical background in the state of Georgia, and that the United States Senate is constituted of representatives of geographical areas ignoring the fact that the National House of Representatives is based on population. They argue that these precedents justify the present system in Georgia no matter how glaring the disparities may be resulting from the shifts in population.

The Court, in the Sanders case, recited at some length the history of the method of apportionment in the House of Representatives of Georgia, because as was there pointed out the county unit method of electing state officials was based upon the apportionment of representatives in the lower House of the State Legislature. We do not consider it necessary to repeat at length this history of the Georgia House of Representatives which can be found at 203 F.Supp. 158, at page 161, et seq., except to point out that the history of the Georgia Legislature since the Constitution of 1868 makes it plain that the 3–2–1 formula of apportionment in the House made its first appearance at that time, and that when it made its appearance this formula was to some degree adjusted to population. History also demonstrates that tremendous shifts in population, have destroyed the 3–2–1 system as a population apportionment basis. The result is that what may have been a reasonable apportionment by population when the system was introduced has, through inaction, become an unreasonable system as relates to population. Only one slight modification has been made, in that there are now eight of the largest counties with three votes in the Legislature, as contrasted to the six that were formerly included. This shift, of course, was of scant, if any, benefit to the counties in which the plaintiffs reside.

Of course reapportionment has taken place after each decennial census under the 3–2–1 formula but this has afforded no relief whatever to the plaintiffs here. (Ga.Code Sections 2–1501, 2–1502, Const. art. 3, § 3, pars. 1, 2.)

A study of the history of the Georgia Senate reveals the fact that for at least the last 125 years election to the Senate has been on the basis of geographical areas, rather than on the basis of population, with two exceptions which will be later commented on. Originally the Senate was comprised of Senators chosen from each of the counties in the State. Later senatorial districts were created, but in 1852 these districts were abolished and the old system of allowing one senator for each county was restored. The Georgia Constitution of 1861 restored the senatorial districts which have continued down to the present time. Of Georgia's 159 counties, all but three of them are combined into three-county senatorial districts. Two of the remaining, Chatham and Effingham, comprise a separate senatorial district and Fulton County, the most populous county in the State, comprises a single senatorial district. Thus, to this very limited extent recognition has been given to the fact that the size of Chatham and Effingham Counties combined and the size of Fulton County warrant their having somewhat more favored treatment than if they were combined in the normal three-county senatorial districts.

Applying these historical facts to the test of invidiousness, we are unable to discern any justification for continuing this system merely because it has an historical basis in Georgia's political institutions. This is so, primarily, because while historically the statute and constitutional requirements remain substantially the same, the passage of time and changing living habits of the people have distorted it into something entirely different from what it was at its genesis.

The next consideration which, under the guidelines laid down by the Supreme Court in Baker v. Carr, we must consider is whether there lies within the elec-

torate of the State of Georgia any possible remedy for the gross inequalities that we have found to exist. In Georgia, as is the case in Tennessee, there is no provision in the State Constitution for initiative or referendum instituted by the people to bring about a change in the Constitution of laws of the State. To argue, as do the defendants here that the plaintiffs should be remitted to the State Legislature to seek the redress which they claim is their constitutional right, would be to expect them to succeed in having these in a dominating position in the State Legislature voluntarily surrender their position. The record is barren as to the likelihood of this occurring. Indeed, the evidence is to the contrary. Their position has been assiduously and effectively enhanced at every opportunity. We conclude, as we did in Sanders v. Gray, that there is no "substantial likelihood under the existing system of plaintiff's obtaining such relief measures as may be needed to accord him his constitutional rights."

Finally, the Court also pointed out in the Sanders case that there is an additional factor of importance when the Federal Court is called upon to invalidate solemnly enacted State constitutions and laws. Bearing in mind the plain lesson laid down by the Supreme Court repeatedly that an alleged violation of constitutional rights by a State must be clear before a Federal Court of equity will lend its power to the disruption of the State election processes, we can not but conclude that the Supreme Court has now, in a case like this, practically laid a mandate on the trial courts to examine into such allegations of constitutional deprivations and grant such relief as the facts may require. The Supreme Court's opinion in Baker v. Carr, a case which, as has been pointed out, is completely similar to that here, ended with these words:

"We conclude that the complaint's allegations of a denial of equal protection present a justiciable constitutional cause of action upon which appellants are entitled to a trial and a decision. The right asserted is within the reach of judicial protection under the Fourteenth Amendment."

### Conclusion as to the Merits

█ The test of invidious discrimination is on the sum of all of the factors which we have discussed, and if the action—here the State statute and the State constitutional requirements complained of—offends what are found to be fundamental political concepts inherent in a republican form of government, giving due regard to each factor and to the rights of the plaintiff and to all others in his suit as compared to the whole, the State laws and the offending provisions of the Constitution must be stricken because of discrimination so excessive as to be invidious. Sanders v. Gray, 203 F. Supp. 158, 170. Viewing the extreme disparities existing in both Houses of the Legislature,[5] against the background of the several factors which we have taken into consideration, we are forced to the conclusion that the present composition of the Georgia Legislature amounts to invidious discrimination against the plaintiffs and all others who are residents of the counties in which plaintiffs reside. It follows, therefore, that the continued operation of the Georgia State government under a legislative system as presently constituted violates plaintiffs' right to equal protection of the law as guaranteed to them by the Fourteenth Amendment to the United States Constitution.

In most legal proceedings a court discharges its function by determining the legal question presented to it, without going further to speculate or give advice as to what alternative action might convert an institution found to be legally deficient into one that is legally acceptable. In other situations, however, particularly in view of the fact that this

---

5. It is alleged in the plaintiffs' complaint that there is no county in the United States as to which the disparity in voting representation in the so-called "popular chamber" is as discriminatory as it is in Georgia. No proof has been offered to establish the correctness of this allegation, but no more widely disparate legislative membership has been called to our attention.

Court is asked to issue a declaratory judgment and to restrain certain acts dealing with the operation of the State government, it may be appropriate for the Court to suggest such guidelines as would indicate what modifications in the existing structure would meet its understanding of what is permissible. In the Sanders case the Court considered it appropriate because the question was "of much public moment" to indicate guidelines within which the Court considered a county unit method of election to be within constitutional standards. In the same way, in view of the fact that as much confusion as can possibly be eliminated touching upon the validity of an election by the people of the state of Georgia should be removed from the minds of all the citizens, we consider it appropriate to indicate the extent to which, in the light of the present Supreme Court guidance the present State Legislature fails to meet constitutional standards.

■ Granting the plaintiffs' petition for declaratory judgment, we determine and hold that so long as the Legislature of the state of Georgia does not have at least one house elected by the people of the State apportioned to population, it fails to meet constitutional requirements.

■ We also determine and hold that the provisions of Sections 47–102 and 47–102.1 of the Georgia Annotated Code requiring rotation of senate seats among the counties of the several senatorial districts is unconstitutional and void.

It is urged by the plaintiffs here that in its decision in the case of Scholle v. Hare, supra, 82 S.Ct. 910, the Court in effect decided that constitutional standards required that not only one House but both Houses of a bi-cameral legislature be related to population. This argument is based upon the following premise: that in the state of Michigan the House of Representatives has long been based on population and only the Senate is apportioned by districts; when an attack was made by Michigan citizens to cause the Court to find a deprivation of the plaintiff's constitutional rights by reason of the disparity in voting strength in the senatorial districts, the Michigan Supreme Court dismissed the suit; thereafter a reversal by the United States Supreme Court, it was claimed, amounted to a determination by the Supreme Court that a cause of action was stated in the state court which required a reversal of the action of the state court. There is some basis for plaintiffs' argument in this direction, especially when we consider that in Mr. Justice Douglas' dissenting opinion in the United States Supreme Court's decision in MacDougall v. Green, he and his colleagues, Justices Black and Murphy, seem to have said that the mere fact that the Federal Constitution itself sanctions inequalities because of the structure of the United States Senate, is no justification for a state also to create inequalities by having similar differences. See dissenting opinion, Mr. Justice Douglas, MacDougall v. Green, 335 U.S. 281, at page 287, 289, 69 S.Ct. 1, 93 L.Ed. 3. However that may be, we do not find any authoritative decision by the Supreme Court that causes us to require that in order to give the plaintiff his constitutional rights the state legislature must be constituted of two Houses, both of which are elected according to population.

We are here dealing with minimal standards only but a state, so long as it maintains the republican form of government that is guaranteed by the constitution, may greatly exceed these minimal standards.

As indicated in the discussion below touching on the relief to be granted, it is not necessary for us at this time to make a final determination on the question whether, if one House of the General Assembly of Georgia is elected according to population, the other House may remain as completely unrelated to population ratios as it is today. Some guidance as to our views on this matter may be furnished by other courts which now have before them somewhat similar problems. For instance, there is now pending in the United States Court for the Middle District of Alabama a suit by residents of

Jefferson County (Birmingham) seeking to cause the Legislature of Alabama to be reapportioned in both Houses according to population. This is the case of M. O. Sims, et al., v. Bettye Frink, Secretary of State, et al., 205 F.Supp. 245. We recognize that the state of Alabama has a constitutional requirement which provides that both Houses of its Legislature are to be "based upon population." Nevertheless the Federal Court will not require the state of Alabama to adopt any higher standard to guarantee equal protection of the laws than is required by the Fourteenth Amendment. In other words, we do not understand that the District Court in that case will require compliance with the Alabama constitution as to both Houses unless this is found by that Court to be required also by the Federal Constitution. Further proceedings in that case have been postponed until July 16th in order, as the Court said, to permit the Alabama Legislature to take such action as it is advised will bring it within the requirements of the Federal Constitution. The Court, however, has entered an order stating that in the event the Alabama Legislature does not act, "or if its action does not meet constitutional standards, then we will be under a clear duty to take some action in time to take effect before the General election of November, 1962." The Court said also, "Such, action, however, should be held to the minimum that is necessary for the citizens of Alabama to be accorded their constitutional rights."

### The Remedy

■ Beyond urging the Court to dismiss the complaint in its entirety, thus to grant no relief, the defendants, other than the Ordinary of DeKalb County, have afforded us no aid in the difficult task of determining what relief, other than the declaration of the plaintiffs' rights, should be afforded the plaintiffs

at this time. We have nevertheless, as is our duty, undertaken to consider all of the relevant factors bearing upon the propriety of granting immediate injunctive relief. The plaintiffs, on the other hand, have not insisted in their argument that the Court immediately grant an injunction. They do, however, insist that the Court take such affirmative action as will make it impossible for the Legislature that is to be elected in the General election on November 6, 1962, to perpetuate the unconstitutional discrimination. Some of the factors which we have considered are the time which now remains before the General election, the time necessary for any party which desires to do so to hold Primary elections for Representatives or Senators, or both.[6] We have also considered the fact that there is now being conducted a vigorous race for nomination for Governor at the September 12th Democratic Primary; we have also considered that there would still be time after the September 12th Primary, if it was deemed desirable, for the Governor to call a special session of the Legislature, and time to give effect to any changes in the laws that might be enacted at such special session, including the promulgation and advertising of a proposed constitutional amendment to be passed upon by the voters at the November 6th General election if the Legislature should be so advised, and such special elections as might be necessary to a reconstituted General Assembly, if it is in fact reconstituted.

Giving full consideration to all of these factors, and recognizing the right of the plaintiffs to have their constitutional rights vindicated at the earliest practicable moment, while at the same time according every presumption of good faith to, and affording a reasonable opportunity to act to, the responsible State officials and the present General Assembly now that the rights of the parties have been

6. Although there is now scheduled a party Primary for the Democratic Party for September 12, 1962, and some of the Representatives and Senators are now doubtless planning to run for nomination in the Democratic Primary to be held on that same date, there is nothing in the law that requires Primaries for election of Representatives or Senators to be held on this or any other particular date.

declared, we have concluded that we should enter no injunction at this time. We have concluded that we should postpone any further proceedings in this matter until the State has had a reasonable opportunity to reconstitute the Legislature so as to meet the constitutional standards here laid down prior to the January, 1963, session. If it appears that the Legislature has taken such action as brings the composition of the General Assembly within such constitutional standards, then this Court need take no further action. If, on the other hand, the Legislature does not act, or if its action does not meet constitutional standards, then we will be under a clear duty to take such action as is necessary and feasible to accord plaintiffs their rights.

The Court retains jurisdiction of the cause for the entry of such other and further orders as may be required.