W.M.C.A., INC., R. Peter Straus, Joseph De Maio, Edward Lind, S. Thomas Delaney, Edward C. Brown, James J. McCafferty, Plaintiffs,

v.

Caroline K. SIMON, Secretary of State of the State of New York, Louis J. Lefkowitz, Attorney General of the State of New York, Paul R. Screvane, President of the City Council of the City of New York, Eugene H. Nickerson, Chairman, Board of Supervisors, Nassau County, Leonard Berman, Chairman, Board of Supervisors, Westchester County, William J. Leonard, Chairman, Board of Supervisors, Suffolk County, Denis J. Mahon, James Power, John R. Crews, Thomas Mallee, Commissioners, Board of Elections, New York City, Defendants.

United States District Court
S. D. New York.
Aug. 16, 1962.

Robinson, Silverman, Pearce & Aronsohn and Max Gross, New York City, for plaintiffs; Leonard B. Sand, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of New York, Albany, N. Y., pro se and for Caroline K. Simon, Secretary of State of New York; Irving Galt, Asst. Sol. Gen., George C. Mantzoros, Sheldon Raab, Asst. Attys. Gen., of counsel.

Leo A. Larkin, Corp. Counsel, New York City, for defendant Paul R. Screvane, President of the City Council of City of New York, and defendants Denis J. Mahon and others, Commissioners of Board of Elections of City of New York; Benjamin Offner, George Dwight, New York City, of counsel.

George W. Percy, Jr., County Atty. for County of Suffolk, Riverhead, N. Y., for defendant William J. Leonard, Chairman, Board of Supervisors, Suffolk County; Stanley S. Corwin, Asst. County Atty., of counsel.

Bertram Harnett, County Atty., for County of Nassau, Mineola, N. Y., for defendant Eugene H. Nickerson, Chairman, Board of Supervisors, Nassau County; Douglas P. Null, Senior Deputy County Atty., of counsel.

Francis J. Morgan, County Atty. of Westchester County, White Plains, N. Y., for defendant Leonard Berman, Chairman, Board of Supervisors, Westchester County; Irving Libenson, Asst. County Atty., of counsel.

Before WATERMAN, Circuit Judge, and RYAN and LEVET, District Judges.

LEVET, District Judge.

This is an action for a judgment declaring that the constitutional and statutory provisions of the State of New York governing the apportionment of Senate and Assembly districts are unconstitutional.

The previous history of the proceedings in this Court appears in W. M. C. A., Inc. v. Simon, D.C.S.D.N.Y.1961, 196 F.Supp. 758, and the action here is the same as the one before this three-judge court in 202 F.Supp. 741 (1962). The original decision was a dismissal of the complaint.

Following the decision in Baker v. Carr, 1962, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, the Supreme Court, on June 11, 1962, vacated the judgment entered upon the opinion by us contained in 202 F.Supp. 741 and remanded the case "for further consideration in the light of Baker v. Carr." 370 U.S. 190 at 191, 82 S.Ct. 1234, at 1236, 8 L.Ed.2d 430.

Accordingly, after due notice to the parties, a hearing was held by this Court

on August 1, 1962 at which time the proofs offered by the parties (in so far as we believed to have been relevant) were submitted and extensive oral argument on the merits of the claim was heard and briefs of the parties submitted. Now after deliberation and reconsideration in the light of Baker v. Carr, supra, we find and conclude as follows:

FACTS

1. The New York State constitutional and statutory provisions are set forth as exhibits in the complaint. (Constitution Art. 3, Sections 2, 3, 4, 5. Statutes —State Law, McKinney's Consol.Laws, c. 57, §§ 120–123.)

2. There is no failure by the legislature to comply with the State Constitution and only the so-called malapportionment of Senatorial and Assembly districts is here involved. (Minutes of Nov. 15, 1961, pp. 32–33.)

3. No purposeful discrimination against any race, religion, creed or sex or national origin is claimed by plaintiffs. (Minutes, August 1, 1962, pp. 31, 32.) The whole objection of plaintiffs is that there is not fair representation of urban areas. (Id. at p. 32.)

The plaintiffs' claim is that the Constitution of the State of New York is unconstitutional under the Federal Constitution. (Id. at pp. 127, 128.)

As to the City of New York, its counsel conceded that there was no allegation of discrimination "other than a discrimination arising from financial matters either in the collection of taxes or the distribution of taxes or funds collected by the State and distributed throughout the whole State to the various communities and cities." (Id. at p. 42.)

■ 4. We take judicial notice of the following:

The revised Constitution of 1894 containing the present apportionment provisions was submitted to the voters on November 6, 1894 and was approved by a vote of 410,697 to 327,402; the legislative apportionment was approved by a vote of 404,335 to 350,625. See Legislative Manual, New York, 1961–1962, page 289. On November 7, 1916, on a vote to revise the Constitution and amend the same, the vote was 506,563 for and 658,269 against. Id. at p. 292. On November 5, 1957, the vote for a convention to revise the Constitution and amend the same was 1,242,568 for and 1,368,063 against. Id. at p. 309.

■ 5. We also, on a similar basis, note:

New York City with a population of 7,781,984 or 46.0% of the state's population of 16,782,304, has 65 assemblymen or 43.3% of the total assembly, and 25 senators or 43.1% of the total number of senators, while the counties other than those in New York City, with 54.0% of the population, have 56.7% of the total assembly and 56.9% of the senate seats.

6. The courts of the State of New York have approved the present methods of apportionment. Matter of Sherrill v. O'Brien, 1907, 188 N.Y. 185, 81 N.E. 124; Matter of Fay, 1943, 291 N.Y. 198, 52 N.E.2d 97; See also Matter of Dowling, 1915, 219 N.Y. 44, 113 N.E. 545.

7. A summary of the provisions of the State Constitution and statutes relative to Senatorial apportionment is substantially as follows:

"The Senate districts are created primarily on the basis of citizen population. A 'ratio' is determined by dividing the citizen population of the State by 50 (the number of Senators); Senate districts are then formed by combining or dividing counties so that each district contains approximately this number (the 'ratio') of citizens. The Constitution provides that each district shall contain as nearly as may be an equal number of inhabitants, excluding aliens, and be in as compact a form as practicable. There are four further provisos: When any county is entitled to more than three Senators, the Senate is enlarged from its minimum size (50) by the number of these additional Senators; no county can have four or

more Senators unless it has a full population ratio for each; no county shall have more than one third of all the Senators; and no two counties that are adjoining or separated by one public waterway shall have more than half of all the Senators. (The last two of these provisos are inoperative, since no counties are entitled to that number of Senators.)" (Opening Memorandum For Defendants Simon and Lefkowitz Before The Statutory Court On Remand From the Supreme Court of the United States, pp. 4–5.)

8. A summary of the provisions of the State Constitution and statutes relative to Assembly apportionment is substantially as follows:

"The total number of Assemblymen is fixed at 150, with every county except Hamilton (which shares one Assemblyman with Fulton County) entitled to one Assemblyman. Sixty-one seats are thus accounted for. The remaining 89 seats, however, are apportioned in this manner: The citizen population of the State is divided by the total number of Assemblymen, and the quotient thus achieved becomes the 'ratio.' Every county whose citizen population equals 1½ times the 'ratio' is entitled to a second Assemblyman. The rest of the seats are then apportioned among those counties with citizen populations greater than twice the 'ratio.' Seats apportioned on remainders are apportioned in order of highest remainders, with the proviso that no county shall have more Assemblymen than a county with a larger citizen population." (Opening Memorandum For Defendants Simon and Lefkowitz Before the Statutory Court On Remand From the Supreme Court of the United States, p. 4.)

While more than one Senate or Assembly district can be contained within the whole of a single county, and while a given Senate district may consist of more than one county, no county border line can be broken in the formation of either type of district.

9. Certain statistical data were submitted by the parties in a *Stipulation* filed on August 1, 1962 and, by order of the court made a part of the record; Plaintiffs' Exhibits 1 through 7 also contain statistical tables. A copy of Tables IV (Appendix A) and VIII (Appendix B) from the said stipulation are appended hereto. These projected statistics of an apportionment based on the 1960 census appear to state the basis of plaintiffs' claims.

10. In the appendices hereto we attach (a) a map of the present Assembly Apportionment, the original of which is contained between pp. 748–749 of the Legislative Manual of the State of New York for the year 1960 (Appendix C), (b) a map of the present Senate Apportionment, the original of which is contained in the same publication between pp. 712–713 (Appendix D), (c) a Table of the Population of State of New York, County Recapitulations, the original of which is contained on pp. 1,030 and 1,031 of the Legislative Manual of the State of New York for the year 1961–1962 (Appendix E). We take judicial notice of the facts therein contained.

## ISSUES

The questions for determination by this Court are as follows:

*First*, do the undisputed facts constitute "invidious discrimination" against the plaintiffs and those similarly situated under the decision of the United States Supreme Court in Baker v. Carr, supra; *second*, assuming an affirmative answer to the first question, to what relief are plaintiffs entitled?

## BAKER v. CARR

We are unable to conclude that the Baker v. Carr decision, supra, has invalidated the particular type of apportionment provisions which are here attacked. We recognize the force of the Baker decision to the full extent indicated by the opinions of the Court. We

acknowledge the validity of jurisdiction as we did before (202 F.Supp. 741). We accept the mandate of justiciability. We test the New York apportionment provisions by such standards as we are able to ascertain.

However, we are unable to premise an invalidity of the provisions of the State of New York upon the Baker v. Carr determination by reason of the absence of applicable indicia.

1. *Mr. Justice Douglas* concurring in Baker v. Carr, supra, stated:

"The traditional test under the Equal Protection Clause has been whether a State has made 'an invidious discrimination,' as it does when it selects 'a particular race or nationality for oppressive treatment.' See Skinner v. Oklahoma, 316 U.S. 535, 541 [62 S.Ct. 1110, 1113, 86 L.Ed. 1655]. Universal equality is not the test; there is room for weighting. As we stated in Williamson v. Lee Optical Co., 348 U.S. 483, 489, [75 S.Ct. 461, 465, 99 L.Ed. 563] 'The prohibition of the Equal Protection Clause goes no further than the invidious discrimination.'" (369 U.S. pp. 244–245, 82 S.Ct. p. 724.)

2. *Mr. Justice Clark* in his concurring opinion in Baker v. Carr, supra, wrote:

"I take the law of the case from MacDougall v. Green, 335 U.S. 281 [69 S.Ct. 1, 93 L.Ed. 3] (1948), which involved an attack under the Equal Protection Clause upon an Illinois election statute. The Court decided that case on its merits without hindrance from the 'political question' doctrine. Although the statute under attack was upheld, it is clear that the Court based its decision upon the determination that the statute represented a rational state policy. It stated:

" 'It would be strange indeed, and doctrinaire, for this Court, applying such broad constitutional concepts as due process and equal protection of the laws, to deny a State the power to assure a *proper* diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former.' Id., at 284 [69 S.Ct. at 2]. (Emphasis supplied.)" (369 U.S. pp. 251–252, 82 S.Ct. 727.)

3. *Mr. Justice Stewart* in his concurring opinion in Baker v. Carr, supra, stated:

"The Court today decides three things and no more: '(a) that the court possessed jurisdiction of the subject matter; (b) that a justiciable cause of action is stated upon which appellants would be entitled to appropriate relief; and (c) * * that the appellants have standing to challenge the Tennessee apportionment statutes.' Ante, pp. 197–198 [82 S.Ct. p. 736].

"The complaint in this case asserts that Tennessee's system of apportionment is utterly arbitrary—without any possible justification in rationality. The District Court did not reach the merits of that claim, and this Court quite properly expresses no view on the subject. Contrary to the suggestion of my Brother Harlan, the Court does not say or imply that 'state legislatures must be so structured as to reflect with approximate equality the voice of every voter.' Post, p. 332 [82 S.Ct. 772]. The Court does not say or imply that there is anything in the Federal Constitution 'to prevent a State, acting not irrationally, from choosing any electoral legislative structure it thinks best suited to the interests, temper, and customs of its people.' Post, p. 334 [82 S.Ct. 773]. And contrary to the suggestion of my Brother Douglas, the Court most assuredly does not decide the question, 'may a State weight the vote of one county or one district more

heavily than it weights the vote in another?' Ante, p. 244 [82 S.Ct. 737].

"In MacDougall v. Green, 335 U.S. 281 [69 S.Ct. 1, 93 L.Ed. 3], the Court held that the Equal Protection Clause does not 'deny a State the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former.' 335 U.S., at 284 [69 S.Ct. at 2]. In case after case arising under the Equal Protection Clause the Court has said what it said again only last Term—that 'the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others.' McGowan v. Maryland, 366 U.S. 420, 425 [81 S.Ct. 1101, 1105, 6 L.Ed.2d 393]. In case after case arising under that Clause we have also said that 'the burden of establishing the unconstitutionality of a statute rests on him who assails it.' Metropolitan Casualty Ins. Co. v. Brownell, 294 U.S. 580, 584 [55 S.Ct. 538, 540, 79 L.Ed. 1070].

"Today's decision does not turn its back on these settled precedents." (pp. 265–266, 82 S.Ct. 736–737.)

4. *Mr. Justice Harlan,* in his dissent to the remand in the case at bar (370 U.S. 190 at 191, 82 S.Ct. 1234, at 1236), stated that Baker v. Carr does not indicate "any guidelines" to be followed by lower courts in deciding cases such as the instant one.

Counsel for plaintiffs has conceded that "There is nothing in the explicit opinion of Baker against Carr which would indicate how ultimately the cases were to be resolved on the merits," although counsel contended that there was "much in Baker against Carr which is implicit." (Minutes, August 1, 1962, p. 107.) This Court is unable to discern this result for which plaintiffs here argue.

## CONSTITUTIONALITY

██ ██ The principle that there is a presumption in favor of the constitutionality of a statute and the principle that a violation must be clear before a a federal court of equity will lend its power to the disruption of the state election processes (Sanders v. Gray, D.C.N.D.Ga.1962, 203 F.Supp. 158, 170) have been re-enunciated in apportionment decisions rendered since the Baker v. Carr determination.

1. In Caesar v. Williams, Supreme Court of the State of Idaho, April 3, 1962, 371 P.2d 241, 9 Idaho Capital Report 161, McFadden, J., wrote:

"In considering the question of the constitutionality of these acts, certain fundamental rules at all times must be kept in mind. The burden of showing the unconstitutionality of a statute is upon the party asserting it. Eberle v. Nielson, 78 Idaho 572, 306 P.2d 1083; Rich v. Williams, 81 Idaho 311, 341 P.2d 432. This court is without power to invalidate or nullify a constitutional act of the legislature; if the legislature does not clearly violate the Constitution, this court must and will uphold it. Padgett v. Williams, 82 Idaho 114, 350 P.2d 353. Every reasonable presumption must be indulged in favor of the constitutionality of a statute. Robinson v. Enking, 58 Idaho 24, 69 P.2d 603; Idaho Gold Dredging Co. v. Balderston, 58 Idaho 692, 78 P.2d 105." (9 Idaho Capital Report 161 at 164.)

2. In Maryland Committee for Fair Representation v. Tawes, Md.Cir.Ct., Anne Arundel County, May 24, 1962, Md., Judge Duckett wrote in part:

"Every intendment must be resolved in favor of constitutionality and the burden of showing unconstitutionality is on the petitioners"

citing McGowan v. Maryland, 366 U.S. 420–426, 81 S.Ct. 1101, 6 L.Ed.2d 393;

Johns Hopkins University v. Williams, 199 Md. 382, 86 A.2d 892; Norris v. Baltimore, 172 Md. 667, 192 A. 531.

3. In Toombs v. Fortson, D.C.N.D.Ga. 1962, 205 F.Supp. 248, 256, the Statutory Court stated:

"* * * there is an additional factor of importance when the Federal Court is called upon to invalidate solemnly enacted State constitutions and laws. Bearing in mind the plain lesson laid down by the Supreme Court repeatedly that an *alleged violation of constitutional rights by the State must be clear* before a Federal Court of equity will lend its power to the disruption of the State election processes, * *." (Emphasis inserted.)

### OTHER DECISIONS

Certain cases decided since Baker v. Carr involved substantial discrepancies between existing legislative apportionments and pre-existing state constitutional provisions. See Caesar v. Williams, Supreme Court of the State of Idaho, April 3, 1962, Idaho, 371 P.2d 241, 9 Idaho Capitol Report 161; Harris v. Shanahan, District Court of Shawnee County, Kansas, Second Division, May 31, 1962, Kan.; Maryland Committee for Fair Representations v. Tawes, State Court of Appeals, Maryland, April 1962, 228 Md. 412, 180 A.2d 656 (Failure of legislature to comply with State Constitution and convene a Constitutional Convention as approved by voters); Lein v. Sathre, D.C.D.N.D., Southwestern Division, May 31, 1962, 205 F.Supp. 536 (Statutory Court); Moss v. Burkhart, D.C.W.D.Okla., June 19, 1962, 207 F. Supp. 885 (Statutory Court); Start v. Lawrence, Commonwealth Court of Pa., June 13, 1962, No. 2536 Equity Docket and No. 187 Commonwealth Docket 1962; Baker v. Carr, D.C.M.D.Tenn., Nashville Div., June 22, 1962, 206 F.Supp. 341; Mikell v. Rousseau, Supreme Court, Chittenden County, Vermont, May Term, 1962, Vt., 183 A.2d 817; Sweeney v. Notte, Jr., Sup.Ct. of Rhode Island, C.Q.

No. 643, R.I., 183 A.2d 296; Sims v. Frink, D.C.M.D.Ala.1962, 205 F.Supp. 245 (Statutory Court).

Other cases post Baker v. Carr involved apportionment arrangements with great disparities, lack of any rational basis and wanting in other respects and thus were far different than those of the present case. Those cases have no applicability here. See Toombs v. Fortson, D.C.N.D.Ga.1962, 205 F.Supp. 248 (Statutory Court); Sanders v. Gray, D.C.N.D. Ga., April 28, 1962, 203 F.Supp. 158 (Statutory Court); Scholle v. Hare, Sup. Ct. of Michigan, June, 1962, Mich., 116 N.W.2d 350; Fortner v. Barnett, Chancery Court of the First Judicial District. of Hinds County, Miss.

### TESTS

Tests for "invidious discrimination" have been held to include the following:

(1) Rationality of state policy and whether or not the system is arbitrary.

(2) Whether or not the present complexion of the legislature has a historical basis.

(3) Whether there lies within the electorate of the State of New York any possible remedy (if gross inequalities. exist.)

(4) Geography, including accessibility of legislative representatives to their electors.

(5) Whether the Court is called upon to invalidate solemnly enacted State Constitutions and laws.

Toombs v. Fortson, D.C.N.D.Ga.1962, 205. F.Supp. 248; Sanders v. Gray, D.C.N.D. Ga.1962, 203 F.Supp. 158; Maryland' Committee for Fair Representation v. Tawes, Md. Circuit Court, Anne Arundel County, Maryland, May 24, 1962, Md.; Baker v. Carr, 1962, 369 U.S. 186, 258, 259, 82 S.Ct. 691, 7 L.Ed.2d 663.

1. *Rationality and Lack of Arbitrariness*

The provisions of the State Constitution (Art. 3 Sec. 5) in reference to

*Assembly Districts* are basically as follows:

(a) Apportionment among the several counties of the state, "as nearly as may be according to the number of their respective inhabitants, excluding aliens."

(b) Every county except Hamilton is entitled to one member.

After establishing a quotient ratio for the whole state further provisions are as follows:

(c) Each county containing less than a ratio and one-half over receives one member.

(d) All other counties (i. e. those having more than a ratio and a half) receive a second member.

(e) The remaining members are apportioned to the counties having the highest remainders in the order thereof.

Nothing in these provisions is arbitrary unless the ingredient of geographical allowance of a minimum of one assemblyman per county is so considered. Certainly there is no classification which treats urban counties differently from other counties. The net result is that assemblymen (subject to the minimum provision per county, like the minimum provision for members in the Federal House of Representatives are in fact substantially based on citizen population.

The provisions of the State Constitution (Art. 3 Sections 2, 3, and 4) in reference to the Senate are basically as follows:

(a) Fifty senatorial districts are established (section 3)

(b) Such districts are, after census returns at specified intervals, to "be so readjusted or altered that each senate district shall contain as nearly as may be an equal number of inhabitants, excluding aliens, and be in as compact form as practicable." (section 4) (Plaintiffs make no claim that the statutes do not reflect the state constitutional provisions)

Certain other requirements augment or implement the foregoing provisions:

(c) No county shall be divided in the formation of a senate district except to make two or more senate districts wholly in such county. (Certain limitations, not too pertinent here prohibit divisions of towns and cities; however, it is noted that counties, towns, etc. which may be included in either of two districts, "shall be so placed as to make said districts most nearly equal in number of inhabitants, excluding aliens".)

(d) No county shall have four or more senators unless it shall have a full ratio for each senator.

(e) Other provisions which today have absolutely no factual application provide that (i) no county shall have more than one third of all the senators and (ii) no two adjoining counties, or counties which are separated only by public waters, shall have more than one-half of all the senators.

Apparently plaintiffs complain of the so called "full ratio rule" the gist of which is as follows:

I. "No county shall have four or more senators unless it shall have a full ratio for each senator." N.Y.Const. Art. III § 4.

II. " * * * except that if any county having three or more senators at the time of any apportionment shall be entitled on such ratio to an additional senator or senators, such additional senator or senators shall be given to such county in addition to the fifty senators, and the whole number of senators shall be increased to that extent." N.Y. Const. Art. III § 4.

The provisions above mentioned do not appear arbitrary or irrational. Unless senatorial districts are to be subject to repeated and relatively frequent readjustments, some practicable means of addition of more senators must be provided.

As stated by Judge Chase in Matter of Dowling, 1916, 219 N.Y. 44, 51, 113 N.E. 545, 546:

"The exception is given for one, and only one purpose, and that is to prevent counties having three or more senators from obtaining a larger number of senators at the ex-

pense of the counties of the state not having 3 or more senators."

These provisions are designed to effectuate administration of the senatorial electorate, and designed to meet accessibility, and practicability. No proof was submitted by plaintiffs that the senatorial districts, aside from some variance in citizen population were otherwise subject to criticism.

The system is not irrational. It clearly gives weight to population within the state's counties which forms a basis for the ingredient of area, accessibility and character of interest.

Such an arrangement is not arbitrary. It has factors adapted to the needs of the State of New York constituted as it is of urban, suburban and rural areas, with congestion of population in one spot, with areas of lesser intensity in other locations and with sparsely settled spaces more remote from the centers of population. All ingredients are present, there is no arbitrariness in formulae or in the result thereof.

2. *Historical Basis*

The present provisions for apportionment are of historic origin. In New York, the county is a classic unit of governmental organization and administration. New York has consistently emphasized county government and the county unitary approach.

*Charles H. Beard* states that in most cases the county units in this country "bear the imprint of precedents dating back to medieval England", (American Government and Politics, *MacMillan* Company, 1949, p. 787.).

As explained by *Ferguson* and *McHenry:*

" * * * When the American colonies were first settled, England was divided into shires, which in turn, were subdivided into parishes, hundreds, manors, and boroughs. When transplanted to the Colonies, the term 'shire' gave way to its synonym 'county'. The County which was first instituted in Virginia, later became the primary unit

of local government in the South, the middle states established both counties and townships. New England used counties and towns, but the former were relegated to a subordinate position." (The American System of Government, McGraw-Hill Book Company, Inc., New York, New York, 6th Ed., 1961, pp. 668, 669.)

*See* also Fairlie and Kneier, County Government and Administration Century Co., New York, 1930, pp. 1–38.

Professor *Cullen B. Gosnell* writes:

" * * * Local Government in the United States can be traced directly to England. The County grew out of the Shire. While the County was not in vogue in England until after the Norman Conquest, it had become well established before the colonization of America." (State and Local Government in the United States, New York, Prentice-Hall, Inc., 1951, p. 14).

*James Bryce* wrote:

"In the middle States of the Union, Pennsylvania, New Jersey and New York, settled or conquered by Englishmen somewhat later than New England, the town and town-meeting did not as a rule exist, and the county was the original basis of organization." (American Commonwealth, MacMillan Company, 1926, Vol. 1., p. 599.)

Bryce also stated:

"The County is perhaps to be regarded at least in New York, Pennsylvania and Ohio, as the true unit, and the townships (for so they are usually called) as its subdivisions." (Ibidem p. 600.)

Professor *Edward P. Cheyney,* of the University of Pennsylvania discussing "The English County and Its Officers, (1600–1650)" stated: "The oldest, most stable and most important unit of local government was the shire, or county." (European Background of American History, 1300–1600, Harper and Brothers, 1904, p. 261.)

*Paul W. Wager,* in County Government Across the Nation, University of North Carolina Press, 1950, p. 157, observed: "During the Colonial period there evolved in New York a system of local government which in its main features, has been perpetuated." *

## CONSTITUTION OF 1777

All of this was recognized by the makers of the constitution of 1777, adopted during the progress of the Revolution in a state in which perhaps one third of the military operations of that war took place. This constitution (Section IV) provided for an assembly of seventy members *"to be annually chosen in the several counties"* (emphasis added), and certain numbers of members for each county were then specified. Section V which followed contained provisions for a census after the termination of the war and at seven year intervals thereafter and for adjustment of the representation of each county. No provision for *omission* of any county from some representation or for combining one county with another appear.

The same constitution (Sections X, XI, XII) provided for a senate of twenty-four freeholders elected for four years, and to be set up in classes so that one quarter were reelected each year. The state was divided for the election of senators into "four great districts"; and the counties to be contained in each district specified as well as the number of senators for each of these "great" districts. After mentioning the state census to be taken, as for assembly purposes, the 1777 constitution provided for reapportionment, "as near as may be, to the number of freeholders in each district" and the addition of a senator to any district in which the number of electors had increased one twenty-fourth part of the whole number of electors, which by the said census, shall be found to be in this state.

*Amendments to the Constitution of 1777*

By delegates to a State convention in 1801 the number of the members of the assembly was increased to one hundred with a provision that the number should never exceed one hundred and fifty. The legislature was directed to apportion the "said one hundred members of the assembly *among the several counties of this state,* (emphasis inserted) as nearly as may be, according to the number of electors which shall be found to be in each county by the census directed to be taken in the present year." (New York State Constitution Annotated, New York State Constitutional Convention Committee 1938, Part II pp. 21, 22).

At the same time the number of senators was fixed at thirty-two so that the entire number (32) are apportioned among the "four great districts" as "nearly as may be, according to the number of electors qualified to vote for senators, which shall be found to be in each of the said districts." (Ibidem p. 22).

## CONSTITUTION OF 1821

A constitutional convention of 1821 submitted a new constitution which was approved by the voters in 1822 and took effect December 31, 1822. This constitution (Ibidem p. 24) provided for a senate of 32 members and an assembly of 128 members. Article 1, Section 5 divided the state into 8 senatorial districts, specified the counties in each and stated that each district should choose four senators. Section 6 provided for reapportionment every ten years so that each district shall contain, as nearly as may be, an equal number etc. Districts were

---

* Each county is allotted one representative in the lower chamber of 23 states; to wit, Alabama, Arizona, Arkansas, Florida, Georgia, Idaho, Maryland, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Utah and Wyoming. (Harvey, Lashley G., Reapportionments of State Legis- latures, 17 Law and Contemporary Problems, 364.) It may also be noted that seven of these states were among the original 13 states of this union. Certain states also assure one senator for each county, to wit Connecticut, Idaho, Maine, Maryland, Montana, New Jersey, Oregon, South Carolina, Vermont and Wyoming. (Ibidem.)

to consist of contiguous territory, and no county was to be divided in the formation of a senate district.

*Section 7* provided that the members of the assembly shall be chosen by counties as nearly as may be, according to the number of inhabitants excluding aliens etc. Every county was to be entitled to one member of the assembly and no new county was to be erected unless its population shall entitle it to a member.

## CONSTITUTION OF 1846

The Constitution of 1846 adopted on November 3, 1846 (Ibidem p. 44) abandoned the groupings known as "four great districts" and set up thirty-two separate senatorial districts in each of which one senator was to be elected, (Art. III, Section 3). Provisions as to equalization of numbers of inhabitants, contiguous territory, and prohibition of division of a county unless entitled to two or more senators appear. (Section 4).

The members of the assembly were to be apportioned *among the several counties,* as nearly as may be, according to the number of inhabitants etc. but the same reservations for each county as before were continued (Section 5).

## CONSTITUTION OF 1894

No further changes were made in apportionment matters until the constitution of 1894 was passed and adopted by the voters as heretofore stated. The present provisions are substantially the same and are elsewhere discussed.

In concluding this discussion of historic origins, it is fair to state that the basic pattern of New York's apportionment provisions are historic in character, fitted to the nature of the governmental development of the Empire State.

## 3. AVAILABILITY OF POLITICAL REMEDY

The vote in 1957 on the call for a constitutional convention was heralded as an issue of apportionment. Governor Harriman stated that the most urgent constitutional reform needed was "to elect one house of the legislature on the basis of population to give big cities fuller representation." New York Times, Sept. 7, 1957, p. 1, col. 8. See New York Times, Sept. 24, 1957, p. 29, col. 1, Oct. 29, 1957, p. 22, col. 5. According to the 1960 census, the six counties represented by the six individual plaintiffs had a citizen population of 9,129,780, or 56.2% of the total State population.

The 10 most heavily populated counties had a population of 11,937,406, or 73.5% of the citizen population of the state. Thus, the majority chose not to convene a constitutional convention.

This tends to negate any compelling circumstances requiring the intervention of federal equity power.

Article XIX, Section 2, of the present constitution provides that "at the general election to be held in the year nineteen hundred fifty-seven, and every twentieth year thereafter, and also at such times as the legislature may by law provide, the question 'Shall there be a convention to revise the constitution and amend the same?' shall be submitted to and decided by the electors of the state." In case a majority decides in favor of this question, delegates are to be elected and a convention held. Delegates are to be chosen as follows: each senatorial district elects 3 delegates; the electors of the state elect 15 delegates-at-large.

It may be noted that it would be entirely possible for the ten most populous counties mentioned in the next paragraph to control a constitutional convention.

## 4. GEOGRAPHICAL DISCRIMINATION

The fact is that the ten most heavily populated counties in the State (Kings, Queens, New York, Bronx, Nassau, Erie, Westchester, Suffolk, Monroe and Onondaga) have, under the current apportionment, 38 senate seats, 65.5% of all the senate and 93 assembly seats, 62.0% of all assembly seats. When the legislature reapportions New York on the basis of the 1960 census figures, these same coun-

ties will have 37 senate seats and 93 assembly seats, 64.9% and 61.3% respectively of the two Houses (minutes, August 1, 1962, pp. 153, 154).

As already indicated geography, accessibility, a proper diffusion of political initiative as between a state's thinly populated counties and those having concentrated masses, have not been cast out as proper factors in apportionment methods.

The six counties in which plaintiffs reside contain 56.2% of the citizen population of the State, but these counties comprise only 3.1% of the area of the state. Bronx, Kings, New York and Queens are the smallest counties in the state. Nassau is the ninth smallest county.

Another factor worthy of consideration is the fact that the interests of the "upstate" counties may be diverse while those of the city districts may be united. Ninety-seven percent of the State's area is outside the six counties in which the plaintiffs reside.

The 40th Senatorial District includes St. Lawrence, Clinton and Franklin counties, an area totalling 5,511 square miles which is larger than the State of Connecticut. St. Lawrence County alone covers 2,767 square miles, which is an area larger than the State of Delaware.

Economic and social matters, extensive resources and their developments, roads, school systems, welfare and other matters emphasize the necessity of some geographic consideration in a state of the size and character of New York. It is arguable that if strict population standards were adopted certain undesirable results might follow such as an increase in the size of the legislature to such an extent that effective debate may be hampered or an increase in the size of districts to such an extent that contacts between the individual legislator and his constituents may become impracticable. The possibility of these results, however, is not determinative as to the issues raised in the case at bar.

## 5. INVALIDATION OF A STATE CONSTITUTIONAL ENACTMENT

Here the plaintiffs seek to invalidate not a mere statute but a state constitutional provision duly propounded and adopted by a Constitutional Convention in 1894. Moreover, these provisions were solemnly ratified as shown above by the voters who since have declined on a number of occasions to vote for a change. This court is, of course, bound to give supremacy to the U. S. Constitution over a State Constitution, but unless the invalidity is clear and definite, we are reluctant to overthrow this choice of the electors of this state.

In this connection we may well heed the wise admonitions of distinguished members of the United States Supreme Court who have spoken as follows:

"The traditions and habits of centuries were not intended to be overthrown when that amendment [the Fourteenth] was passed." Opinion of Mr. Justice Holmes in Interstate Consolidated Street Railway Co. v. Massachusetts, 1907, 207 U.S. 79, 87, 28 S.Ct. 26, 27, 52 L.Ed. 111.

"The Constitution as a continuously operating Charter of Government does not demand the impossible or the impractical." Opinion of Chief Justice Stone in Hirabayashi v. United States, 1943, 320 U.S. 81, 104, 63 S.Ct. 1375, 1387, 87 L.Ed. 1774.

" * * * [T]he legislature, acting within its sphere, is presumed to know the needs of the people of the State." Opinion of Chief Justice Hughes in Townsend v. Yeomans, 1937, 301 U.S. 441, 451, 57 S.Ct. 842, 847, 81 L.Ed. 1210.

## CONCLUSIONS

We are of the opinion and hereby conclude that

(1) The plaintiffs have not shown by a fair preponderance of the relevant evidence that "invidious discrimination" exists.

■ (2) The apportionment provisions of the State of New York are rational, not arbitrary, are of substantially historical origin, contain no geographical discrimination, permit an electoral majority to alter or change the same and are not unconstitutional under the relevant decisions of the United States Supreme Court.

(3) The defendants who have opposed this action are entitled to a dismissal of the complaint on the merits as against plaintiffs and against such defendants as have attempted to sustain plaintiffs' claims.

■ (4) No costs should be allowed to or against any party hereto since this is a matter of public interest and concern.

The foregoing constitute our findings of fact and conclusions of law. Let judgment be entered pursuant to the opinion herein.

In view of this determination there is no necessity of passing on the standing of W.M.C.A., Inc. as a party plaintiff herein.

APPENDIX A

IV

The following apportionment would result if the New York State Legislature reapportioned the Senate under the present constitutional formula, on the basis of 1960 Census statistics.

| County | Citizen Population | Senators | Citizen Population Per Senator |
|---|---|---|---|
| Bronx | 1,368,207 | 4 | 342,052 |
| Erie | 1,039,648 | 3 | 346,549 |
| Kings | 2,518,510 | 7 | 359,787 |
| Nassau | 1,275,801 | 3 | 425,267 |
| New York | 1,584,069 | 4 | 396,017 |
| Queens | 1,733,081 | 5 | 346,616 |
| | | On basis of second ratio | |
| Albany | 269,088 | 1 | 269,088 |
| Monroe | 571,029 | 3 | 190,343 |
| Niagara | 235,677 | 1 | 235,677 |
| Oneida | 259,330 | 1 | 259,330 |
| Onondaga | 414,770 | 2 | 207,385 |
| Suffolk | 650,112 | 3 | 216,704 |
| Westchester | 782,179 | 3 | 260,726 |
| All other counties | 3,539,285 | 17 | 208,193 |
| Entire State | 16,240,786 | 57 | 284,926 |

## APPENDIX B

### VIII

The following apportionment would result if the New York State Legislature reapportioned the Assembly under the present constitutional formula, on the basis of the 1960 census statistics.

| County | 1960 Citizen Population in Each Assembly District |
|---|---|
| Schuyler | 14,974 |
| Yates | 18,552 |
| Schoharie | 22,410 |
| Lewis | 23,064 |
| Greene | 30,931 |
| Putnam | 31,006 |
| Seneca | 31,235 |
| Orleans | 33,845 |
| Wyoming | 34,534 |
| Essex | 34,987 |
| Tioga | 37,610 |
| Cortland | 40,685 |
| Chenango | 42,979 |
| Delaware | 43,237 |
| Warren | 43,594 |
| Livingston | 43,690 |
| Allegany | 43,759 |
| Franklin | 43,915 |
| Sullivan | 44,434 |
| Columbia | 46,734 |
| Washington | 48,135 |
| Otsego | 51,588 |
| Genesee | 53,416 |
| Madison | 54,262 |
| Fulton & Hamilton | 55,067 |
| Montgomery | 56,287 |
| Tompkins | 64,227 |
| Herkimer | 65,218 |
| Wayne | 67,344 |
| Ontario | 67,410 |
| Clinton | 71,389 |
| Cayuga | 73,240 |
| Cattaraugus | 79,548 |
| Oswego | 85,356 |
| Dutchess (2 districts)  Approx. | 85,698 |
| Jefferson | 86,606 |

| County | | 1960 Citizen Population in Each Assembly District |
|---|---|---|
| Saratoga | | 88,134 |
| Orange (2 districts) | Approx. | 89,937 |
| Monroe (4 districts) | Approx. | 95,172* |
| Steuben | | 97,176 |
| Chemung | | 97,891 |
| Onondaga (4 districts) | Approx. | 103,693 |
| Broome (2 districts) | Approx. | 104,799 |
| Nassau (4 districts) | Approx. | 106,317* |
| NEW YORK STATE AVERAGE | | 108,272 |
| Suffolk (4 districts) | Approx. | 108,352* |
| Richmond (2 districts) | Approx. | 108,382 |
| St. Lawrence | | 109,082 |
| Bronx (6 districts) | Approx. | 114,017* |
| Erie (6 districts) | Approx. | 115,516* |
| Queens (9 districts) | Approx. | 115,539* |
| Ulster | | 116,818 |
| Niagara (2 districts) | Approx. | 117,839 |
| Kings (15 districts) | Approx. | 119,929* |
| Oneida (2 districts) | Approx. | 129,665 |
| Westchester (6 districts) | Approx. | 130,363 |
| Rockland | | 131,834 |
| New York (12 districts) | Approx. | 132,006 |
| Albany (2 districts) | Approx. | 134,544 |
| Rensselaer | | 140,933 |
| Nassau (6 districts) | Approx. | 141,756* |
| Chautauqua | | 143,832 |
| Schenectady | | 150,688 |
| Bronx (4 districts) | Approx. | 171,026* |
| Erie (2 districts) | Approx. | 173,275* |
| Queens (4 districts) | Approx. | 173,308* |
| Kings (4 districts) | Approx. | 179,894* |
| Monroe (1 district) | Approx. | 190,343* |
| Suffolk (1 district) | Approx. | 216,704* |

\* Assembly districts distributed among senatorial districts in conformity with the requirement: "In counties having more than one senate district, the same number of assembly districts shall be put in each senate district, unless the assembly districts cannot be evenly divided among the senate districts in any county, in which case one more assembly district shall be put in the senate district in such county having the largest, or one less assembly district shall be put in the senate district in such county having the smallest number of inhabitants." N.Y.Const., Art. III, § 5, Para. 4 (1894). The population in districts in the multi-member counties may vary due to the rule precluding the division of towns and blocks.

## APPENDIX C

MAP SHOWING

NUMBER OF

**MEMBERS OF ASSEMBLY**

APPORTIONED TO EACH COUNTY IN STATE

*Pursuant to Chapter 893, Laws of 1953, 2nd extra. sess.*

## APPENDIX D

MAP SHOWING

**58 SENATORIAL DISTRICTS**

OF

**NEW YORK STATE**

Established by Chapter 893, Laws of 1953, 2nd extra. session; amended by Chapter 2, Laws of 1954; Chapter 821, Laws of 1954, extra. session.

## APPENDIX E

| COUNTIES | Population | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1915 | 1920 | 1925 | 1930 | 1940 | 1950 | 1960 Final |
| Albany | 183,330 | 186,106 | 197,138 | 211,953 | 221,315 | 239,386 | 272,926 |
| Allegany | 40,216 | 36,842 | 36,815 | 38,025 | 39,681 | 43,784 | 43,978 |
| Bronx | 615,600 | 732,016 | 872,168 | 1,265,258 | 1,394,711 | 1,451,277 | 1,424,815 |
| Broome | 90,641 | 113,610 | 135,060 | 147,022 | 165,749 | 184,698 | 212,661 |
| Cattaraugus | 72,756 | 71,323 | 73,778 | 72,398 | 72,652 | 77,901 | 80,187 |
| Cayuga | 65,751 | 65,221 | 65,344 | 64,751 | 65,508 | 70,136 | 73,942 |
| Chautauqua | 116,818 | 115,348 | 128,100 | 126,457 | 123,580 | 135,189 | 145,377 |
| Chemung | 59,017 | 65,872 | 72,292 | 74,680 | 73,718 | 86,827 | 98,706 |
| Chenango | 36,648 | 34,969 | 35,610 | 34,665 | 36,454 | 39,138 | 43,243 |
| Clinton | 47,561 | 43,898 | 46,145 | 46,687 | 54,006 | 53,622 | 72,722 |
| Columbia | 44,111 | 38,930 | 42,726 | 41,617 | 41,464 | 43,182 | 47,322 |
| Cortland | 30,074 | 29,625 | 31,051 | 31,709 | 33,668 | 37,158 | 41,113 |
| Delaware | 45,995 | 42,774 | 43,452 | 41,163 | 40,989 | 44,420 | 43,540 |
| Dutchess | 91,044 | 91,747 | 99,028 | 105,462 | 120,542 | 136,781 | 176,008 |
| Erie | 571,897 | 634,688 | 693,616 | 762,408 | 798,377 | 899,238 | 1,064,688 |
| Essex | 32,461 | 31,871 | 32,042 | 33,959 | 34,178 | 35,086 | 35,300 |
| Franklin | 46,181 | 43,541 | 45,915 | 45,694 | 44,286 | 44,830 | 44,742 |
| Fulton | 45,625 | 44,927 | 46,028 | 46,560 | 48,597 | 51,021 | 51,304 |
| Genesee | 40,707 | 37,976 | 43,420 | 44,468 | 44,481 | 47,584 | 53,994 |
| Greene | 30,091 | 25,796 | 28,207 | 25,808 | 27,926 | 28,745 | 31,372 |
| Hamilton | 4,491 | 3,970 | 4,242 | 3,929 | 4,188 | 4,105 | 4,267 |
| Herkimer | 64,109 | 64,962 | 66,708 | 64,006 | 59,527 | 61,407 | 66,370 |
| Jefferson | 81,009 | 82,250 | 85,776 | 83,574 | 84,003 | 85,521 | 87,835 |
| Kings | 1,798,513 | 2,018,356 | 2,203,991 | 2,560,401 | 2,698,285 | 2,738,175 | 2,627,319 |
| Lewis | 25,947 | 23,704 | 24,713 | 23,447 | 22,815 | 22,521 | 23,249 |
| Livingston | 38,427 | 36,830 | 39,264 | 37,560 | 38,510 | 40,257 | 44,053 |
| Madison | 41,742 | 39,535 | 40,807 | 39,790 | 39,598 | 46,214 | 54,635 |
| Monroe | 319,310 | 352,034 | 392,174 | 423,881 | 438,230 | 487,632 | 586,387 |
| Montgomery | 61,030 | 57,928 | 61,385 | 60,076 | 59,142 | 59,594 | 57,240 |
| Nassau | 116,825 | 126,120 | 207,640 | 303,053 | 406,748 | 672,765 | 1,300,171 |
| New York | 2,137,747 | 2,284,103 | 1,945,029 | 1,867,312 | 1,889,924 | 1,960,101 | 1,698,281 |
| Niagara | 108,550 | 118,705 | 133,437 | 149,329 | 160,110 | 189,992 | 242,269 |
| Oneida | 167,331 | 182,833 | 196,486 | 198,763 | 203,636 | 222,855 | 264,401 |
| Onondaga | 213,992 | 241,465 | 267,009 | 291,606 | 295,108 | 341,719 | 423,028 |
| Ontario | 54,628 | 52,652 | 55,240 | 54,276 | 55,307 | 60,172 | 68,070 |
| Orange | 118,118 | 119,844 | 125,629 | 130,383 | 140,113 | 152,255 | 183,734 |
| Orleans | 33,919 | 28,619 | 30,692 | 28,795 | 27,760 | 29,832 | 34,159 |
| Oswego | 75,929 | 71,045 | 71,404 | 69,645 | 71,275 | 77,181 | 86,118 |
| Otsego | 48,534 | 46,200 | 47,404 | 46,710 | 46,082 | 50,763 | 51,942 |
| Putnam | 12,767 | 10,802 | 12,500 | 13,744 | 16,555 | 20,307 | 31,722 |
| Queens | 396,727 | 469,042 | 713,891 | 1,079,129 | 1,297,634 | 1,550,849 | 1,809,578 |
| Rensselaer | 121,330 | 113,129 | 118,429 | 119,781 | 121,834 | 132,607 | 142,585 |
| Richmond | 98,634 | 116,531 | 138,277 | 158,346 | 174,441 | 191,555 | 221,991 |
| Rockland | 46,903 | 45,548 | 56,479 | 59,599 | 74,261 | 89,276 | 136,803 |
| St. Law'ce | 90,291 | 88,121 | 91,806 | 90,960 | 91,098 | 98,897 | 111,239 |
| Saratoga | 62,982 | 60,029 | 65,606 | 63,314 | 65,606 | 74,869 | 89,096 |
| Schenectady | 98,625 | 109,363 | 116,708 | 125,021 | 122,494 | 142,497 | 152,896 |

| COUNTIES | Population | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1915 | 1920 | 1925 | 1930 | 1940 | 1950 | 1960 Final |
| Schoharie | 23,005 | 21,303 | 21,565 | 19,667 | 20,812 | 22,703 | 22,616 |
| Schuyler | 13,954 | 13,098 | 13,456 | 12,909 | 12,979 | 14,182 | 15,044 |
| Seneca | 25,249 | 24,735 | 25,363 | 24,983 | 25,732 | 29,253 | 31,984 |
| Steuben | 83,630 | 80,627 | 82,175 | 82,671 | 84,927 | 91,439 | 97,691 |
| Suffolk | 104,342 | 110,246 | 143,208 | 161,055 | 197,355 | 276,129 | 666,784 |
| Sullivan | 38,189 | 33,163 | 40,192 | 35,272 | 37,901 | 40,731 | 45,272 |
| Tioga | 25,549 | 24,212 | 26,111 | 25,480 | 27,072 | 30,166 | 37,802 |
| Tompkins | 36,535 | 35,285 | 39,559 | 41,490 | 42,340 | 59,122 | 66,164 |
| Ulster | 85,367 | 74,979 | 83,052 | 80,155 | 87,017 | 92,621 | 118,804 |
| Warren | 32,977 | 31,673 | 34,070 | 34,174 | 36,035 | 39,205 | 44,002 |
| Washington | 46,955 | 44,888 | 46,661 | 46,482 | 46,726 | 47,144 | 48,476 |
| Wayne | 53,476 | 48,827 | 51,785 | 49,995 | 52,747 | 57,323 | 67,989 |
| W'chester | 321,713 | 344,436 | 425,798 | 520,947 | 573,558 | 625,816 | 808,891 |
| Wyoming | 33,028 | 30,314 | 30,827 | 28,764 | 31,394 | 32,822 | 34,793 |
| Yates | 18,841 | 16,641 | 17,668 | 16,848 | 16,381 | 17,615 | 18,614 |
| Totals | 9,687,744 | 10,385,227 | 11,162,151 | 12,588,066 | 13,479,142 | 14,830,192 | 16,782,304 |

RYAN, District Judge (concurring).

This suit seeks to invoke the "equal protection" clause of the Fourteenth Amendment to the United States Constitution.

Plaintiffs allege that Article III (Sections 2–5) of the New York Constitution, which designates the method of geographic apportionment of Senators and Assemblymen to be elected to the State Legislature, is unconstitutional because it discriminates against the urban residents of the state and, therefore, conflicts with the "equal protection" clause.

We do not find that "invidious discrimination" exists or that it is impossible to change the State Constitution by a non-judicial means.

In the Supreme Court's remand of this case, the *per curiam* opinion stated:

" * * * we held in Baker v. Carr, 369 U.S. 186, [82 S.Ct. 691], that a justiciable federal constitutional cause of action is stated by a claim of arbitrary impairment of votes by means of invidiously discriminatory geographic classification."

In the majority opinion of Baker v. Carr, Justice Brennan stated:

" * * * it [is] open to courts * * * to determine * * * that a discrimination reflects no policy, but simply arbitrary and capricious action."

"Invidious discrimination" is an irrational and inconstant action against a group of citizens. We do not find that the New York State apportionment policy is irrational; all that plaintiffs have illustrated is that the apportionment is not based solely on population. But as was said in MacDougall v. Green, 335 U.S. 281, 283, 69 S.Ct. 1, 2,

"To assume that political power is a function exclusively of numbers is

to disregard the practicalities of government."

There are other criteria for determining apportionment besides population. In Baker v. Carr, Justice Harlan said:

"Nothing in the Federal Constitution [stops] a State * * * from choosing any electoral legislative structure it thinks is best suited to the interests, temper, and customs of its people. * * *"

Such factors as the interests of counties, geography, and concentration of political power, may also be considered. The six plaintiff counties contain 56.2% of the state's population, but they contain only 3.1% of its area. (P. 23 *Opening Memorandum for Defendants—Before the Statutory Court On Remand from The Supreme Court of the United States.*) If apportionment were based solely on population, this would mean that 3% of the state's area would dominate the rest of New York. Even if the urban representatives were to sincerely endeavor to care for the interests of the state as a whole, it is unlikely that they might be able to fully understand the problems of the remaining vast area of the state. Each rural member of the Legislature presently represents a much greater area than his urban counterpart. If population were to be made the sole criterion of apportionment, the area per representative in certain districts would increase even further. Representatives might not adequately represent localities which were not their home and, correspondingly, the residents of these localities might lose the benefits of the democratic governmental process.

Besides this absence of "invidious discrimination", the New York State Constitution provides that the question "Shall there be a convention to revise the constitution and amend the same?" shall be put before the people every twentieth year. (Article XIX, Section 2.) In 1957, a majority voted "No" to this question even though a majority of those voting came from the urban areas. This seems to indicate that most of the voting citizens of New York are satisfied with the current system.

The situation in New York is different than in other states where the Court, in granting the relief requested, stated that one of the prime reasons was that there was no remedy within the electorate. Toombs v. Fortson, D.C., Georgia, 205 F.Supp. 248.

We concur in the findings of fact and conclusions of law reached by Judge LEVET; we conclude that this Court has jurisdiction over the subject matter of the suit and this jurisdiction has been exercised and, after trial and examination of the statutes involved and of the undisputed facts, we conclude that the complaint herein should be dismissed upon its merits.

WATERMAN, Circuit Judge.

I concur, as does Chief Judge RYAN, in the findings of fact and conclusions of law contained in the Opinion of Judge LEVET. I concur with my colleagues in ordering that the complaint herein be dismissed upon its merits.